676 F.2d 1023
 HAITIAN REFUGEE CENTER, an unincorporated, not-for-profit
organization; Solomon Jocelyn; Prosper Bayard; Theodore
Cadet; Emile Beliard; Odlilus Jean; Alteon Jean Bellias;
Indique Dormeus; Augustin Sennecharles, Plaintiffs-Appellees,
v.
William French SMITH, Attorney General of the United States;
Alexander M. Haig, Jr., Secretary of State; David Crosland,
Acting Commissioner of Immigration and Naturalization
Service; Raymond Morris, District Director, Immigration and
Naturalization Service, District Office Number 6,
Defendants-Appellants.
 No. 80-5683.
 United States Court of Appeals,
Fifth Circuit.
 Unit B*
May 24, 1982.
 
 Atlee W. Wampler, III, U. S. Atty., Lloyd G. Bates, Jr., Asst. U. S. Atty., Miami, Fla., Daniel E. Fromstein, Atty., U. S. Dept. of Justice, Crim. Div., Washington, D. C., for defendants-appellants.
 Peter Schey, Los Angeles, Cal., Gary Lee Caldwell, Florida Rural Legal Services, Inc., W. Palm Beach, Fla., Ira J. Kurzban, Miami, Fla., Dale Swartz, Washington, D. C., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HILL and VANCE, Circuit Judges, and LYNNE**, District Judge.
 JAMES C. HILL, Circuit Judge:
 
 
 1
 On May 9, 1979, eight black Haitian nationals and the Haitian Refugee Center (HRC), an unincorporated association seeking to assist Haitians in this country, filed a class action in federal district court on behalf of over 4,000 Haitians in the south Florida area who had sought political asylum in the United States.[1] Named as defendants were the Attorney General, the Secretary of State, the Commissioner of the Immigration and Naturalization Service (INS), and the District Director of Office No. 6 of the INS in Miami, Florida.
 
 
 2
 The complaint, framed in sixteen counts, challenged the expedited administrative procedure employed by the INS in processing the asylum applications of members of the plaintiff class. The district court summarized the allegations as follows:
 
 
 3
 The plaintiffs are not trying to litigate the merits of any single decision by INS or a particular immigration judge. Rather, the gravamen of the plaintiffs' complaint is that INS instituted a program "to achieve expedited mass deportation of Haitian nationals" (Complaint, P 3) irrespective of the merits of an individual Haitian's asylum application and without regard to the constitutional, treaty, statutory, and administrative rights of the plaintiff class.
 
 
 4
 Haitian Refugee Center v. Civiletti, 503 F.Supp. 442, 457 (S.D.Fla.1980). Briefly, the plaintiffs attacked actions taken by immigration judges in the context of deportation hearings, the manner in which asylum interviews were scheduled and conducted, and the manner in which decisions on the asylum claims were made and rendered.[2] The plaintiffs also alleged that, through all of the enumerated practices, the defendants engaged in unlawful discrimination on the basis of national origin and denied the due process rights of the class members.[3]
 
 
 5
 In its final order of judgment entered July 2, 1980, the district court held: "The manner in which INS treated the more than 4,000 Haitian plaintiffs violated the Constitution, the immigration statutes, international agreements, INS regulations and INS operating procedures. It must stop." 503 F.Supp. at 452. Accordingly, the district judge ordered the defendants to "submit for the court's approval a detailed plan providing for the orderly, case-by-case, nondiscriminatory and procedurally fair reprocessing of the plaintiffs' asylum applications to the District Director before individuals competent to hear such applications upon a full record which will permit meaningful judicial review." Id. at 532. The court further enjoined the defendants from deporting any member of the plaintiff class and from proceeding further with any deportation hearings or any asylum applications involving the plaintiff class until the court had approved the defendants' plan for reprocessing. Id. at 532-33.
 
 
 6
 On appeal the government attacks the district court's exercise of jurisdiction, its finding of fifth amendment equal protection and due process violations, its entry of findings on the conditions of life in Haiti, and its comments on the burden of proof borne by asylum applicants. For the reasons developed below, we affirm the judgment of the district court with modifications. Before we address various issues raised by the government, however, it is important that we set out the administrative and factual background against which this litigation developed.[4]
 
 
 7
 * A
 
 
 8
 An alien seeking political asylum in the United States has two avenues available to him. First, under regulations promulgated by the INS[5] in 8 C.F.R. § 108 and in force prior to May 10, 1979,[6] the alien may apply for asylum with the local INS district director, who may grant or deny the request in his discretion. 8 C.F.R. § 108.2 (1978). The procedure established by INS contemplates that the applicant will submit his request on Form I-589 and later appear for a personal interview with the immigration officer who will handle the application. Id. §§ 108.1, 108.2. At the interview the applicant must be "given an opportunity to fully present his case," and the immigration officer must "insure that all questions (on Form I-589) have been answered and that the applicant has no additional factors he may wish to have considered." INS Operations Instruction (hereinafter O.I.) 108.1(a).
 
 
 9
 The immigration officer then classifies the asylum claim as clearly meriting asylum, as doubtful, or as clearly lacking in substance. In all doubtful cases the INS must seek an advisory opinion from the State Department before rendering a decision. The INS may act on cases clearly warranting or clearly not warranting asylum without prior referral of the claim to the State Department. In the latter case, however, the State Department must be notified of the denial of asylum and a stay of the alien's departure granted for thirty days or until the State Department responds. 8 C.F.R. § 108.2 (1978); O.I. 108.1(a).
 
 
 10
 The district director must issue a written decision on an asylum request. No administrative appeal lies from his decision, except in the case of denial of an application on which the State Department has submitted a favorable recommendation. In such a case, appeal lies to the regional commissioner of the INS. In all cases in which an opinion from the State Department is relied upon, that Department's report must be incorporated in the record of the asylum proceeding, and the alien must be given an opportunity to examine and rebut the report. 8 C.F.R. § 108.2 (1978).
 
 
 11
 INS also has prescribed the effect that a request to the district director for asylum is to have on pending deportation hearings. If the asylum claim is advanced between issuance of a show cause order and commencement of the deportation hearing thereon or during the deportation hearing itself, the special inquiry officer (also called immigration judge) conducting the deportation hearing must suspend the hearing until the district director has completed action on the asylum request. O.I. 108.1(f)(1), 108.1(f)(2).
 
 
 12
 The second avenue for asylum is a claim before an immigration judge for the discretionary relief of withholding deportation, as provided for in section 243(h) of the Immigration and Nationality Act (hereinafter the Act)[7] or Article 33 of the United Nations Protocol Relating to the Status of Refugees.[8] A denial by the district director of an asylum claim adjudicated under 8 C.F.R. § 108 procedures does not prejudice the alien's right to seek withholding of deportation. 8 C.F.R. § 108.2 (1978). Hence, the discretionary relief available under section 243(h) of the Act is the functional equivalent of asylum. Theoretically the alien has the privilege of a de novo determination by the immigration judge of his claim of a well-founded fear of persecution. The district court found, however, that in practice the decision of the immigration judge on an asylum claim never differed from the local district director's decision. 503 F.Supp. at 454.
 
 B
 
 13
 The program of accelerated processing to which the plaintiff class was subjected by the INS-what the district court termed the "Haitian Program"- embodied the government's response to a tremendous backlog of Haitian deportation cases that had accumulated in the INS Miami district office by the summer of 1978. By June of that year between six and seven thousand unprocessed Haitian deportation cases were pending in the Miami office. These staggering numbers were not the result of a massive influx of Haitians to south Florida over a short period. Although significant numbers of Haitians had entered the United States from Haiti and the Bahamas in the spring of 1978,[9] the backlog was primarily attributable to a slow trickle of Haitians over a ten year period and to the confessed inaction of the INS in dealing with these aliens. According to Richard Gullage, Deputy District Director of the Miami office who served as Acting District Director in September 1978 and again from November 1978 to March 1979, INS officials in Miami simply "were not doing (their) job." Plaintiffs' Exhibit 311 at 39.
 
 
 14
 The district court identified several reasons for INS' administrative inactivity in the face of a burgeoning Haitian caseload. First, uncertainty over the effect of the impending promulgation of new regulations governing asylum procedures inhibited any initiative by the Miami office. In addition, immigration judges in the area had adopted the practice of inquiring at the beginning of Haitian deportation hearings whether the alien intended to seek asylum. This practice invited asylum claims and, under the regulations, required postponement of the deportation hearing when the alien replied affirmatively. Finally, litigation concerning the due process rights of the Haitians in asylum proceedings[10] contributed to the slow-footedness of the Miami office. 503 F.Supp. at 512.[11] As the district court found, by June of 1978 it was the perception of the INS "that the asylum process as it had been administered up to that point was the cause (of the administrative delay and consequent backlog). In attempting to work out from under the backlog, the treatment of Haitian asylum claims would have to change." Id.C
 
 
 15
 Change it did. In July and August of 1978 a program of accelerated processing of Haitian cases was designed at the national level of the INS to resolve the "Haitian problem" in the Miami office.
 
 
 16
 Many officials provided input in the planning process.[12] Assigned by Mario Noto, Deputy Commissioner of the INS, with the task of assessing the Haitian situation in Miami, INS Regional Commissioner Armand J. Salturelli submitted the recommendation, among others, that processing could be expedited by ceasing the practice of suspending deportation hearings upon the making of an asylum claim. Plaintiffs' Exhibit 307 at 3. Salturelli acknowledged that this would contravene Operations Instruction 108.1(f), but suggested that this provision should be cancelled or "at least be suspended insofar as Haitians are concerned." Id. One July 1978 report from the Intelligence Division of INS to the Associate Director of Enforcement advised in absolute terms that the Haitians were "economic" and not political refugees and, in belated recognition of the obvious,[13] warned the Enforcement Division that favorable treatment of these Haitians would encourage further immigration. Plaintiffs' Exhibit 368. Associate Director of Enforcement, Charles Sava, later visited Miami to find space for holding an increased number of deportation hearings and to discuss with Miami personnel the processing of Haitians. Out of those discussions arose recommended deterrence measures, which Sava outlined in a letter to Deputy Commissioner Noto. These included detention of arriving Haitians likely to abscond, blanket denials of work permits for Haitians, swift explusion of Haitians from the United States, and enforcement actions against smugglers. Plaintiffs' Exhibit 321.
 
 
 17
 Planning of the Haitian program culminated in a memorandum sent on August 20, 1978 by Deputy Commissioner Noto to INS Commissioner Leonel J. Castillo. The memo explained the basic mechanics of the accelerated processing already being implemented in the Miami district office. Among the specifics set forth were the assignment of additional immigration judges to Miami, the instructions to immigration judges to effect a three-fold increase in productivity, and orders for the blanket issuance of show cause orders in all pending Haitian deportation cases.[14]
 
 
 18
 What occurred at the district level once the policy of the Haitian program was in place was aptly described by Acting District Director Gullage. Under immense pressure from the Central Office of INS to achieve rigid numerical goals, Gullage testified: "(T)he fact was that (the Deputy Commissioner) dumped, he put the responsibility for the program on the district and he said, move it." Plaintiffs' Exhibit 311 at 37. That exhortation was reinforced personally by Deputy Commissioner Noto, who visited the Miami office in mid August 1978. He advised INS trial attorneys to cooperate with the U.S. Attorney's office in enforcement actions against smugglers, encouraging attorneys to point out "THE DIMENSIONS OF THE HAITIAN THREAT" and the fact that "these are unusual cases dealing with individuals that are threatening the community's well-being-socially & economically." Plaintiffs' Exhibit 100 at 5. Noto emphasized the importance of speed in processing Haitian cases. Responding to an inquiry on treatment of an alien's claim of the right to remain silent in deportation hearings, he commented, "When mute, go with punches and give the most publicity to it to discourage (them)," and later "When aliens refused to speak, why can't you deny (the) pol(itical) asylum request?" Id. at 6.
 
 
 19
 In accordance with the goal of high productivity demanded of the Miami office, Gullage issued a memorandum to all personnel in the office, stating "processing of these cases cannot be delayed in any manner or in any way. All supervisory personnel are hereby ordered to take whatever action they deem necessary to keep these cases moving through the system." Plaintiffs' Exhibit 294A at 2. The Haitian cases were processed at an unprecedented rate. Prior to the Haitian program only between one and ten deportation hearings were conducted each day. Plaintiffs' Exhibit 311 at 60. During the program immigration judges held fifty-five hearings per day, or approximately eighteen per judge, id. at 65; at the program's peak the schedule of deportation hearings increased to as many as eighty per day. Id.
 
 
 20
 At the show cause or deportation hearing, the immigration judges refused to suspend the hearing when an asylum claim was advanced, requiring the Haitians instead to respond to the pleadings in the show cause order and proceeding to a finding of deportability. The order entered by the judge allowed the Haitian ten days for filing an asylum claim with the district director, then ten days to request withholding of deportation from the immigration judge if the asylum deadline was not met. Failure to seek withholding in a timely manner effected automatic entry of a deportation order. Id. at 49, 60-61.
 
 
 21
 Deportation hearings were not the only matter handled during the Haitian program. Asylum interviews also were scheduled at the rate of forty per day. Immigration officers who formerly had worked at the airport were enlisted as hearing officers for these interviews. Prior to the program such interviews had lasted an hour and a half; during the program the officer devoted approximately one-half hour to each Haitian. In light of the time-consuming process of communication through interpreters, the district court concluded that only fifteen minutes of substantive dialogue took place.[15] Consistent with the result-oriented program designed to achieve numerical goals in processing, the Travel Control section in the Miami office recorded the daily totals of asylum applications processed. The tally sheet contained space only for the total number of denials; there was no column for recording grants of asylum.
 
 
 22
 Hearings on requests for withholding deportation also were being conducted simultaneously with asylum and deportation hearings, at several different locations. It was not unusual for an attorney representing Haitians to have three hearings at the same hour in different buildings; this kind of scheduling conflict was a daily occurrence for attorneys throughout the Haitian program. The INS was fully aware that only approximately twelve attorneys were available to represent the thousands of Haitians being processed, and that scheduling made it impossible for counsel to attend the hearings.[16] Plaintiffs' Exhibit 311 at 250, 272. It anticipated the scheduling conflicts which in fact occurred. Nevertheless the INS decided that resolving the conflicts was "too cumbersome for us to handle" and adopted the attitude that everything would simply work out. Id. at 249.[17]
 
 
 23
 Under the circumstances described, we conclude that INS had knowingly made it impossible for Haitians and their attorneys to prepare and file asylum applications in a timely manner. The district court found from the evidence at trial that adequate preparation of a Form I-589 required between ten and forty hours of an attorney's time. The court further estimated that, if each of the attorneys available to represent the Haitians "did nothing during a 40 hour week except prepare Forms I-589, they would have been able to devote only about 2 hours to each client." 503 F.Supp. at 522.
 
 
 24
 The results of the accelerated program adopted by INS are revealing. None of the over 4,000 Haitians processed during this program were granted asylum.[18]
 
 II
 
 25
 We proceed now to examine the jurisdictional issues raised by the government's appeal. With respect to the first three counts of the plaintiffs' complaint,[19] the government presents two arguments: (1) the district court lacked subject matter jurisdiction because these matters lie within the exclusive jurisdiction conferred upon the courts of appeals in 8 U.S.C. § 1105a(a), and (2) even if the district court properly had jurisdiction, it should have declined to exercise that jurisdiction because the plaintiffs have failed to exhaust their administrative remedies. On the government's view of this case, the doctrine of exhaustion of administrative remedies also precluded district court action on counts four through sixteen.
 
 
 26
 * Under section 106(a) of the Immigration and Nationality Act, 8 U.S.C. § 1105a(a) (1976), the courts of appeals are vested with exclusive jurisdiction to review "all final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings under section 1252(b) (deportation hearings) ...." According to the government, the Supreme Court has construed the scope of a court of appeals' jurisdiction under this statute to encompass all determinations made by an immigration judge during and incident to a deportation hearing and reviewable by the Board of Immigration Appeals (BIA). Foti v. INS, 375 U.S. 217, 229, 84 S.Ct. 306, 313, 11 L.Ed.2d 281 (1963). The first three counts in the complaint attack aspects of the deportation proceedings-the failure to suspend proceedings when an asylum claim was raised, the setting of ten-day limits for filing asylum claims, and the mass scheduling of hearings.
 
 
 27
 The government's point is not without merit. In Foti v. INS, the Supreme Court held an immigration judge's denial of a request to suspend deportation to be reviewable only in a court of appeals. Because "the administrative discretion to grant a suspension of deportation ha(d) historically been exercised as an integral part of the proceedings which ... led to the issuance of a final deportation order," the court concluded that Congress must have been aware of this administrative practice and intended to include it within the court of appeals' jurisdiction when it enacted section 106(a). 375 U.S. at 223, 84 S.Ct. at 310. Later in Giova v. Rosenberg, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) (per curiam), the Court construed "all final orders of deportation" to encompass the BIA's denial of a motion to reopen deportation proceedings. Called upon again to clarify the meaning of the statutory language, the Court in Cheng Fan Kwok v. INS, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), held that a district director's denial of a stay of deportation was not reviewable in the first instance in the court of appeals. The Court's analysis broadly suggested, however, that any attack upon the proceeding in which a deportation order was entered or upon any matter " 'intimately and immediately associated' " with the final order or "governed by the regulations applicable to the deportation proceeding itself, and ... ordinarily presented to the special inquiry officer who entered the deportation order" would fall within the court of appeals' exclusive jurisdiction under section 106(a). Id. at 217, 88 S.Ct. at 1976 (footnotes omitted) (emphasis added).
 
 
 28
 Under the principles of these cases, it is arguable that count one (failure to suspend the deportation hearing) is reviewable only in the court of appeals. The ruling at issue was made by the immigration judge during the course of the deportation hearing, was a matter governed by INS Operations Instructions,[20] and presumably would be reviewable by the BIA upon appeal of the deportation order itself. Whether counts two and three allege actions within section 106(a) jurisdiction is even more ambiguous.[21]
 
 
 29
 Notwithstanding any surface appeal to the government's argument, we are convinced that insofar as the first three counts set forth matters alleged to be part of a pattern and practice by immigration officials to violate the constitutional rights of a class of aliens they constitute wrongs which are independently cognizable in the district court under its federal question jurisdiction.[22] Although a court of appeals may have sole jurisdiction to review alleged procedural irregularities in an individual deportation hearing to the extent these irregularities may provide a basis for reversing an individual deportation order, that is not to say that a program, pattern or scheme by immigration officials to violate the constitutional rights of aliens is not a separate matter subject to examination by a district court and to the entry of at least declaratory and injunctive relief. The distinction we draw is one between the authority of a court of appeals to pass upon the merits of an individual deportation order and any action in the deportation proceeding to the extent it may affect the merits determination, on the one hand, and, on the other, the authority of a district court to wield its equitable powers when a wholesale, carefully orchestrated, program of constitutional violations is alleged.[23]
 
 
 30
 In concluding that the district court had jurisdiction over the first three counts, we wish to emphasize the factual uniqueness of this case. Our holding is not to be construed as permitting a constitutional challenge in the district court based on a procedural ruling in a deportation proceeding with which an alien is dissatisfied. We refuse to condone any such end-run around the administrative process. Casting as a constitutional violation an interlocutory procedural ruling by an immigration judge will not confer jurisdiction on the district court. Such a result would indeed defeat the congressional purpose behind the enactment of section 106(a)-the elimination of dilatory tactics by aliens challenging deportation orders in piecemeal fashion. Congress resolved this problem by consolidating jurisdiction over challenges to final orders of deportation in one court, the court of appeals. We do not intend by our holding today to emasculate that solution, and given the narrowness of our holding, we do not expect such a result.
 
 B
 
 31
 The government also contends that the procedural errors challenged in counts one through three and in counts four through sixteen are subject to internal agency review and, therefore, are not subject to judicial review prior to exhaustion of available administrative remedies.[24] As a general rule parties are required to pursue administrative remedies before resorting to the courts to challenge agency action. We agree with the district court, however, that the exhaustion requirement is not a jurisdictional prerequisite but a matter committed to the sound discretion of the trial court. NLRB v. Industrial Union of Marine and Shipbuilding Workers, 391 U.S. 418, 419, 426 n.8, 88 S.Ct. 1717, 1719, 1723 n.8, 20 L.Ed.2d 706 (1968); see Ecology Center of Louisiana, Inc. v. Coleman, 515 F.2d 860, 865-66 (5th Cir. 1975). For a number of reasons, we conclude that the district court did not abuse its discretion in exercising jurisdiction notwithstanding any failure of the plaintiffs to exhaust administrative remedies.
 
 
 32
 The policies advanced by allowing the administrative process to run its full course are not thwarted by judicial intervention in this case. Among those policies are (1) allowing the agency to develop a more complete factual record; (2) permitting the exercise of agency discretion and expertise on issues requiring this; (3) preventing deliberate disregard and circumvention of established agency procedures; and (4) enhancing judicial efficiency and eliminating the need for judicial vindication of legal rights by giving the agency the first opportunity to correct any error. McKart v. United States, 395 U.S. 185, 193-95, 89 S.Ct. 1657, 1662-63, 23 L.Ed.2d 194 (1969); see Ecology Center of Louisiana, Inc., 515 F.2d at 866.
 
 
 33
 With respect to the plaintiffs' attack on actions taken by immigration judges (counts 1-3), further development of the factual record via completion of deportation hearings and subsequent appeal to the BIA would not significantly aid judicial review; to the extent these procedural irregularities are alleged to constitute part of a scheme denying the due process and equal protection rights of the Haitians, they raise legal and not factual issues. Moreover, they present the kind of issues on which the INS possesses no particular expertise. In addition, there is no danger that the exercise of jurisdiction will promote disregard of agency procedures since we have indicated above that it is the rare case in which jurisdiction to review procedural rulings made in a deportation hearing properly lies in the district court.[25]
 
 
 34
 Finally, the judicial efficiency argument fails to convince us that the trial court should have insisted on exhaustion. As did the district court, we find the rationale of Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), more persuasive. Faced with a procedural due process attack on the adequacy of an agency's proceedings and an exhaustion of remedies argument, the Supreme Court deemed it insignificant that the agency in that case possessed the power to change the content of its procedures and thus could have pretermitted the necessity for judicial intervention. The Court commented: "It is unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context." Id. at 330, 96 S.Ct. at 900. The assumption that the INS or the BIA would have substantially revised the procedures established for the Haitian program is equally naive. In addition, in concluding that review of the plaintiff's constitutional challenge was appropriate in Mathews despite a conceded failure to exhaust internal agency review measures, the Court deemed it significant that the plaintiff's "constitutional challenge is entirely collateral to his substantive claim of entitlement" to the benefit denied him by the agency. Id. Similarly here the plaintiffs mount a constitutional attack on the procedures devised for the processing of their asylum claims and do not seek a reversal of the district director's denial of their claims for asylum.
 
 
 35
 In sum, we believe that judicial economy was enhanced by the district judge's consideration of counts 1-3 in light of the role the immigration judges were alleged to play in the single scheme to deny the Haitians' constitutional rights.[26] The doctrine of exhaustion of administrative remedies erected no bar to the district court's jurisdiction, and the trial judge acted within his discretion in considering these claims.
 
 
 36
 We reach the same conclusion with respect to counts 4-16. These claims relate to alleged irregularities in the asylum interview and decisionmaking process. It is tautological that the exhaustion doctrine does not preclude the exercise of jurisdiction when there are no further administrative remedies to pursue. Such is the case with counts 4-16.
 
 
 37
 According to 8 C.F.R. § 108.2, "no appeal shall lie" from the district director's decision on an asylum application. To the extent this provision also bars internal agency review of any procedure employed in the asylum processing context, it can be said that there are no remedies to exhaust. More conclusive of this point is the fact that immigration judges and the BIA have no authority to review actions of the district director. The BIA possesses only such authority as is conferred upon it by the Attorney General. 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 1.10 c, at 1-65 (1981). The scope of the BIA's appellate jurisdiction is set forth in 8 C.F.R. § 3.1(b).[27] That jurisdiction does not include review of alleged procedural irregularities in the conduct of asylum proceedings.
 
 
 38
 The government nevertheless protests that further administrative remedies are available to the plaintiffs and that exhaustion of these is mandatory. The government refers specifically to the alien's privilege to petition under 8 U.S.C. § 1253(h) for the withholding of deportation after the immigration judge has determined deportability. A denial of withholding would then be reviewable by the BIA and subsequently in the appropriate court of appeals under 8 U.S.C. § 1105a(a).
 
 
 39
 At least one district court has held that an alien must seek the discretionary relief available under § 1253(h) before it may review a district director's denial of political asylum sought under 8 C.F.R. §§ 108.1 and 108.2. Chen Chaun-Fa v. Kiley, 459 F.Supp. 762, 765 (S.D.N.Y.1979). However wise or correct requiring exhaustion of the optional § 1253(h) remedy may be when an alien seeks a review on the merits of the asylum determination, the instant case, in which it has been found that the procedures employed frustrated any merits determinations, is distinguishable, and we refuse to mandate exhaustion of the optional remedy. When the correctness of an asylum denial is at issue, as in Chen Chaun-Fa, the policy of securing more complete development of the factual record is advanced by requiring the alien to seek withholding; for the immigration judge must make a determination on exactly the issue the alien brings before the court, i.e., whether there is a well-founded fear of persecution if the alien is returned to his country. That policy is not served here since, as we pointed out above, the Haitians are testing only the legality of the procedures used. Furthermore, although an alien may appeal a denial of withholding to the BIA, which has authority to correct any procedural irregularities in a case properly within its jurisdiction,[28] the Board's power is limited to correction of errors in the proceeding before it. Hence the BIA could not grant relief for procedural errors in asylum proceedings before the district director.
 
 III
 
 40
 Stating that the processing of an alien's asylum application must conform to the standards of due process, 503 F.Supp. at 455, the district court held that the plaintiffs had proven a "wide variety of defects in the processing of Haitian asylum claims" which resulted in a denial of procedural due process. Id. at 519.[29] The government challenges that conclusion.
 
 
 41
 The government does not dispute the general proposition that even aliens who have entered the United States unlawfully are assured the protections of the fifth amendment due process clause. The Supreme Court has stated:
 
 
 42
 There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law.... Even one whose presence in this country is unlawful, involuntary or transitory is entitled to that constitutional protection.
 
 
 43
 Mathews v. Diaz, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) (citations omitted). Moreover, in spite of the broad power of Congress "to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country," Lem Moon Sing v. United States, 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1894), the executive is subject to the constraints of due process in implementing and enforcing congressional immigration policy. Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954); The Japanese Immigrant Case, 189 U.S. 86, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721 (1903).
 
 
 44
 These principles, however, only begin our inquiry. Procedural due process is not itself an independent right, but merely the condition precedent to the deprivation of a life, liberty, or property interest. See Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); Van Alstyne, Cracks in "The New Property": Adjudicative Due Process in the Administrative State, 62 Cornell L.Rev. 445, 455 (1977). We must therefore identify a constitutionally protectible interest which triggers the safeguards of the due process clause. In short, we must determine whether the individual interest threatened by the administrative action in this case "is one within the contemplation of the '(life), liberty or property' language of the Fifth Amendment." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); Board of Regents, 408 U.S. at 571, 92 S.Ct. at 2705. Once we find that a protected interest is implicated, "the question remains what process is due." Morrissey, 408 U.S. at 481, 92 S.Ct. at 2600.
 
 
 45
 * Besides protected interests which originate in the Constitution itself,[30] the Supreme Court has also recognized that constitutionally protected liberty or property interests may have their source in positive rules of law, enacted by the state or federal government and creating a substantive entitlement to a particular governmental benefit.[31] In this case we conclude that Congress and the executive have created, at a minimum, a constitutionally protected right to petition our government for political asylum. Specifically, we find in the federal regulations establishing an asylum procedure-[32] regulations duly promulgated pursuant to congressional delegation of authority to the Attorney General[33] and having the force and effect of law-, when read in conjunction with the United States' commitment to resolution of the refugee problem as expressed in the United Nations Protocol Relating to the Status of Refugees and in 8 U.S.C. § 1253(h), a clear intent to grant aliens the right to submit and the opportunity to substantiate their claim for asylum. Cf. Logan v. Zimmerman Brush Co., --- U.S. ----, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (right to use adjudicatory procedures established by state as property interest protected by fourteenth amendment due process clause).
 
 
 46
 As we have noted elsewhere,[34] the United States became a party to the United Nations Protocol Relating to the Status of Refugees, which incorporates the 1951 United Nations Convention Relating to the Status of Refugees, in 1968. By accession to the Protocol the United States agreed, as stated in Article 33 of the Convention, not to deport a refugee "to frontiers or territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." If this commitment by the United States is to have substance at all, it must mean at least that the alien is to be allowed the opportunity to seek political asylum, even if the grant of that benefit is discretionary.[35] Recognizing this, in 1974 the INS published the provisions found in Part 108 of Title 8 of the Code of Federal Regulations to establish the machinery by which the alien is permitted to petition for political asylum in the United States. In other words, Congress, through a designated agency, chose to implement the policy expressed in the Protocol by creating in the alien the right to submit and substantiate a claim of risk of persecution should he be deported to his country.
 
 
 47
 We concede that the right we find is but a fragile one. There is no constitutionally protected right to political asylum itself.[36] Although fragile, the right to petition is nevertheless a valuable one to its possessor.[37] By it he may at least send his message and be assured of the ear of the recipient.[38] Whether this minimal entitlement be called a liberty or property interest, we think it is sufficient to invoke the guarantee of due process.[39]
 
 B
 
 48
 Recognizing the existence of an entitlement in the right to petition for political asylum does not define the particulars of what the government may or may not do in making a decision on that petition. Mindful of the Supreme Court's admonition that courts ought not impose constitutional restraints which would inhibit the ability of the political branches to respond through immigration policy to changing world conditions,[40] we hold simply that the government violates the fundamental fairness which is the essence of due process when it creates a right to petition and then makes the exercise of that right utterly impossible.[41]
 
 
 49
 In determining what process is due, the Supreme Court has repeatedly emphasized that "the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged. Thus it has become a truism that 'some form of hearing' is required before the (individual) is finally deprived of a protected ... interest." Logan v. Zimmerman Brush Co., --- U.S. ----, ----, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982) (quoting Board of Regents v. Roth, 408 U.S. 564, 570-71 n.8, 92 S.Ct. 2701, 2705 n.8, 33 L.Ed.2d 548 (1972)). Moreover, the hearing must be conducted "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).
 
 
 50
 We think it strains credulity to assert that these plaintiffs were given a hearing on their asylum claims at a meaningful time and in a meaningful manner. We recognize that the constitutional adequacy of the exact timing and nature of the required hearing must be judged by balancing the competing private and governmental interests at stake. Logan, --- U.S. at ----, 102 S.Ct. at 1157 (citing Goss v. Lopez, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975)); Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976). It is in light of these interests and the nature of the procedures used to process the Haitians' asylum claims that we conclude that the plaintiffs constitutionally are due more process than they received.
 
 
 51
 The specific factors to be considered in weighing the competing interests include: the private interest to be affected by the official action; the likelihood of governmental error through the procedures used; the probable value of additional procedural safeguards; and the governmental interest at stake, including the fiscal and administrative burdens entailed by additional procedural safeguards. Logan, --- U.S. at ----, 102 S.Ct. at 1157; Mathews v. Eldridge, 424 U.S. at 335, 96 S.Ct. at 903. The plaintiffs certainly have an interest in proving their entitlement to political asylum under the conditions set by the Protocol and in rebutting the State Department's general conclusion that Haitians are primarily economic refugees. In addition, the risk that the INS will make an erroneous asylum determination under the procedures used here is unacceptably high. The speed alone with which the entire program was pursued undermined the probability that a record could be assembled to afford a basis for informed decisionmaking. When speed was combined with knowingly created scheduling conflicts and unattainable filing deadlines, uninformed and unreliable decisions were almost assured.[42] Although the government does have an interest in acting with dispatch, it is also in the government's interest to make informed determinations.[43] That this is so, and that requiring additional procedural safeguards would be valuable and not unduly burdensome, are evidenced by the regulations and procedures normally applicable to asylum proceedings, but largely ignored in this case. The normal scheme for asylum processing contemplates full opportunity for the alien to present his case,[44] receipt of State Department advice when the district director is unable to classify the case as clearly meritorious or clearly nonmeritorious,[45] and opportunity for the applicant to rebut State Department reports.[46] The degree of extra burden imposed by requiring, at a minimum, adherence to established procedures is minimal. Any administrative burden caused by slowing the entire process to allow sufficient time to avoid multiple scheduling conflicts and to accord opportunity for full presentation of individual cases cannot alone tip the constitutional balance in favor of the government scheme actually pursued in this case.[47]
 
 
 52
 In sum, via the Haitian program, the government created conditions which negated the possibility that a Haitian's asylum hearing would be meaningful in either its timing or nature. Under such circumstances, the right to petition for political asylum was effectively denied.
 
 
 53
 We therefore find sufficient legal warrant under the fifth amendment for that part of the district judge's order requiring the government to submit a procedurally fair plan for the orderly reprocessing of the plaintiffs' asylum applications.[48]
 
 
 54
 The district court undertook to analyze an equal protection claim upon appellees' contention that the Haitians were victims of unlawful discrimination on the basis of national origin. In view of our conclusions announced above, a resolution of the issue is unnecessary. If there be an equal protection component to this situation it would appear in the ad hoc action of INS officials in formulating and implementing, on their own, a special plan altering what has been provided by Congress and by regulation for all aliens seeking asylum, the altered rights and duties being made applicable by the INS only to aliens of a particular national origin while the lawfully mandated procedures remain applicable to all other aliens seeking asylum. We have found that these actions denied appellees at least a valuable right-created by law-without due process, and we do not address the equal protection contentions any more than to observe that we do not approve the sweeping conclusions of the district court.
 
 IV
 
 55
 We are also persuaded that in some respects the injunction entered by the district court is overbroad. Although a federal court has broad equitable powers to remedy constitutional violations, it must tailor the scope of injunctive relief to fit the nature and extent of the constitutional violation established. Califano v. Yamasaki, 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979); Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1977). Today we affirm the district court's conclusion that the defendants' accelerated program of processing Haitian asylum and deportation cases deprived the plaintiffs of due process of law. The Haitians, however, have not asked us to condemn the regulatory procedures for asylum processing and deportation in effect prior to May 10, 1979. Yet the district court's order broadly prohibits INS from deporting any plaintiffs or from further processing asylum applications under any procedure without prior court approval. To the extent the district judge prevented the INS from acting under these pre-existing regulations and procedures, we think he exceeded his authority. The injunction is modified accordingly. If the INS desires nevertheless to take exceptional action to expedite matters, prior court approval is necessary.
 
 V
 
 56
 The district judge devoted a large portion of his opinion to the entry of findings of fact on the conditions of life in Haiti. 503 F.Supp. at 474-510. Among other things, the judge concluded that a State Department Study Team Report examining the treatment of Haitians returned to that country was unworthy of credence because of defects in methodology. Id. at 482-93. After conducting his own review of the power structure, prisons, legal systems, politics, society, and economics of Haiti, id. at 493-510, the judge also determined that the Haitians' asylum claims "were more political than recognized" and that INS' "uniform rejection of their claims demonstrates a profound ignorance, if not an intentional disregard, of the conditions in Haiti." Id. at 510.
 
 
 57
 The government contends on relevancy grounds that the district court erred in entering findings of fact on life in Haiti. We agree in part.[49] The evidence concerning conditions in Haiti was relevant and admissible only for the limited purpose of showing the scope of evidence available to plaintiffs to support their asylum claims and thus of corroborating the plaintiffs' due process contention that the accelerated program made it impossible for them to submit and substantiate their applications. We agree with the government, however, that the district judge exceeded his authority to the extent he implied by his findings and conclusions that the plaintiffs' claims of fear of persecution merited the granting of asylum.[50]
 
 
 58
 However relevant the conditions in Haiti might be to a review on the merits of a denial of asylum, that issue was not before the district court. The district court itself repeatedly emphasized that the Haitians were not litigating "the merits of any single decision by INS or a particular immigration judge." Id. at 457. For the same reasons, we believe the district court also erred in its conclusion that the State Department Report was unreliable.
 
 
 59
 Once the undocumented alien has the opportunity to present his or her asylum claim, the weighing of evidence and evaluation of its reliability will be for the district director. It was improper for the district judge to find other than that the applicant had a non-frivolous claim to present. Furthermore, it is contemplated that the INS will present a procedure providing due process in and for the filing and consideration of asylum claims. When, under such procedures, these matters are returned to the INS, they shall proceed with no judicial determination of entitlement to asylum vel non.
 
 VI
 
 60
 Finally, the government objects that the district court improperly shifted the burden of proof on an asylum claim from the applicant to the government. The language which, according to the government, effected this shift reads: "It is beyond dispute that some Haitians will be subjected to the brutal treatment and bloody prisons of Francois Duvalier upon their deportation. Until INS can definitely state which Haitians will be so treated and which will not, the brutality and bloodletting is (sic) its responsibility." 503 F.Supp. at 510. We choose to treat this language as harmful dictum. As we noted above,[51] the district court was not asked to review the merits of any asylum determination by the district director and therefore had no cause to assess whether the asylum applicant had sustained his burden of proof. It is clear that the district court's language must be construed as dictum only. In granting injunctive relief the court ordered that the government's reprocessing plan comply with INS regulations and operating procedures in force prior to May 10, 1979. Id. at 532. These regulations clearly place the burden of proof on the asylum applicant. 8 C.F.R. § 242.17(c) (1978). See Fleurinor v. INS, 585 F.2d 129, 133 (5th Cir. 1978); Martineau v. INS, 556 F.2d 306, 307 (5th Cir. 1977); Henry v. INS, 552 F.2d 130, 131 (5th Cir. 1977); Daniel v. INS, 528 F.2d 1278, 1279 (5th Cir. 1976). It properly remains there.
 
 
 61
 For the foregoing reasons, the judgment of the district court is
 
 
 62
 AFFIRMED AS MODIFIED.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 **
 Honorable Seybourn H. Lynne, U. S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 For purposes of class certification the district court defined the plaintiff class as "all Haitian nationals who have applied for political asylum on or before May 9, 1979 under 8 C.F.R. § 108, and whose applications were or may be denied by the INS District Director or his designee in INS District Office No. 6, Miami, Florida." Record, vol. 4, at 860
 
 
 [2]
 More specifically, the first fourteen counts of the complaint alleged the following: failure of immigration judges to suspend deportation hearings upon the alien's assertion of a claim for asylum; the establishment by immigration judges of arbitrary time limits within which an asylum application had to be filed; mass scheduling of deportation hearings and asylum interviews; conduct of asylum interviews in an arbitrary and oppressive manner; failure of INS to maintain a verbatim record of asylum interviews; failure to maintain prior asylum decisions for public inspection; failure to allow inspection of the record of asylum proceedings and of non-record material upon which the defendants relied in making asylum determinations; arbitrary and erroneous classification of all asylum claims as clearly lacking in substance; issuance of form letter denials which contained no statement of the grounds for denial of asylum; failure to forward all evidence supportive of the asylum claim to the State Department for its evaluation; failure of the State Department to evaluate asylum claims fairly; taking of statements from the plaintiffs without advising them of their right to remain silent and of the possible use of these statements against them in subsequent asylum and deportation hearings; refusal of INS to allow HRC to inform asylum applicants of the availability of free legal services; and incarceration or official intimidation of plaintiffs who exercised their fifth amendment right against self-incrimination
 
 
 [3]
 These fifth amendment issues formed the basis of counts 15 and 16 of the complaint
 
 
 [4]
 The background material set forth in parts IA, B & C infra is a summary of the more detailed discussion contained in the district court's opinion at 503 F.Supp. at 454-56, 511-29
 
 
 [5]
 In section 103(a) of the Immigration and Nationality Act, Congress delegated to the Attorney General the authority to administer and enforce the Act. 8 U.S.C. § 1103(a) (1976). That section permits the Attorney General to promulgate regulations, issue instructions, delegate his authority, and "perform such other acts as he deems necessary for carrying out his authority" under the immigration statutes. Id. The INS in turn is the delegatee of such authority as the Attorney General chooses to confer. See id. § 1103(b)
 
 
 [6]
 The INS issued new regulations under 8 C.F.R. § 108 which became effective on May 10, 1979. These regulations altered the procedure for INS handling of asylum applications. All members of the plaintiff class had applied for political asylum prior to May 10. This litigation therefore proceeded on the theory that the regulations in force prior to that date were applicable to these Haitians
 
 
 [7]
 8 U.S.C. § 1253(h) (1976) (amended 1980). That section authorizes the Attorney General "to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason."
 
 
 [8]
 In 1968 the United States acceded to the United Nations Protocol Relating to the Status of Refugees, entered into force with respect to the United States November 1, 1968, 19 U.S.T. 6223, T.I.A.S. No. 6577. The Protocol defines a refugee as one having a "well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion." The obligations of the United States toward aliens falling within this definition are set out in Articles 32 and 33 of the United Nations Convention Relating to the Status of Refugees, as incorporated in the Protocol. The former article prohibits expulsion of a "lawful" refugee except on grounds of "national security or public order," and then only pursuant to a decision reached in accordance with due process of law. Article 33 also prohibits deportation of a refugee "to the frontiers or territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Article 3 further requires the United States to apply the provisions of the Protocol "without discrimination as to race, religion or country of origin."
 The obligations of the United States as set forth in the Protocol have informed the asylum policy of the United States as expressed in 8 U.S.C. § 1253(h). See Coriolan v. INS, 559 F.2d 993, 996 (5th Cir. 1977).
 
 
 [9]
 The district court found that the influx of Haitians deported from the Bahamas did not contribute to the backlog of deportation cases since that influx involved excludable and not deportable Haitians. 503 F.Supp. at 511 n.91
 
 
 [10]
 See, e.g., Pierre v. United States, 547 F.2d 1281 (5th Cir.), vacated and remanded, 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977); Sannon v. United States, 427 F.Supp. 1270 (S.D.Fla.1977), vacated and remanded without opinion, 566 F.2d 104 (5th Cir. 1978)
 
 
 [11]
 It is highly likely that INS' inaction provided the greatest inducement to the ultimate swollen tide of incoming, undocumented Haitians. Record material suggests that a large percentage of the aliens bought passage to the United States from promoters in Haiti whose best sales pitch was the large number of the prospect's countrymen who, without visas or other documents, had reached Florida and were residing there undisturbed. Protestations by INS of the illegality of such operations could hardly be expected to prevail against the proprietary reasoning that Haitians who reached southern Florida were living, working and earning in the United States. "The proof of the pudding" was surely seen as being in the eating; those deciding whether or not to make the trip were not dissuaded by witnessing the return of earlier emigrEes
 
 
 [12]
 As the district court noted, "(w)hile not each of the proposals was implemented, each adds a shading to the intent which colored every action thereafter." 503 F.Supp. at 512
 
 
 [13]
 See note 11 supra & accompanying text
 
 
 [14]
 During July and August of 1978 the INS had also enlisted the support of other agencies in the planning of the Haitian program. For example, the State Department agreed to cooperate in the deterrence effort by pursuing a propaganda campaign in the Caribbean area advertising the United States' refusal to grant work permits to arriving Haitians. Plaintiffs' Exhibit 2 at 3
 
 
 [15]
 According to expert testimony presented at trial, it often takes "a minimum of an hour just to get the basic information and to probe and ask more questions" during the asylum interview. Transcript at 1494
 
 
 [16]
 Efforts had been made by the INS to secure representation for the Haitians, especially pro bono, in the Miami area. The response it received is an ugly reflection on the commitment with which the bar meets its responsibility to make legal services available to the disadvantaged
 
 
 [17]
 The district court noted that, in light of the scheduling difficulties, attorneys were given continuances. The court also pointed out, however, that granting a continuance simply postponed the conflict to another day. 503 F.Supp. at 524
 
 
 [18]
 Following cessation of the program, a few of the asylum applications originally denied were reconsidered and granted
 
 
 [19]
 See note 2 supra
 
 
 [20]
 See O.I. 108.1(f)(2); O.I. 241.3; O.I. 243.3b
 
 
 [21]
 For example, the district judge found that immigration judges had no authority to establish filing deadlines for asylum applications. 503 F.Supp. at 521-22. Moreover, count two could easily be characterized as a challenge not to a ruling by the immigration judge but to the action of the district director in dismissing the asylum claim for want of prosecution when the filing deadline was not met
 
 
 [22]
 28 U.S.C. § 1331(a). The district court is also given jurisdiction over claims arising under the immigration statutes. 8 U.S.C. § 1329 (1976)
 
 
 [23]
 We caution that in the latter situation the district court has no authority to review on the merits any ultimate determination by the INS on the issue of deportability or any discretionary relief sought before the immigration judge during the deportation proceeding. See part V infra
 
 
 [24]
 The members of the plaintiff class are at varying stages in the administrative process
 
 
 [25]
 See part IIA supra
 
 
 [26]
 The district court found that the immigration judges worked hand in hand with the district director to expedite the processing of Haitians at all costs and thus were an integral part of the accelerated program which the plaintiffs attack. 503 F.Supp. at 522, 523
 
 
 [27]
 (b) Appellate jurisdiction. Appeals shall lie to the Board of Immigration Appeals from the following:
 (1) Decisions of special inquiry officers in exclusion cases, as provided in Part 236 of this chapter.
 (2) Decisions of special inquiry officers in deportation cases, as provided in Part 242 of this chapter, except that no appeal shall lie from an order of a special inquiry officer under § 244.1 of this chapter granting voluntary departure within a period of at least 30 days, if the sole ground of appeal is that a greater period of departure time should have been fixed.
 (3) Decisions on applications for the exercise of the discretionary authority contained in section 212(c) of the act, as provided in Part 212 of this chapter.
 (4) Decisions involving administrative fines and penalties, including mitigation thereof, as provided in Part 280 of this chapter.
 (5) Decisions on petitions filed in accordance with section 204 of the act (except petitions to accord preference classifications under section 203(a)(3) or section 203(a)(6) of the act, or a petition on behalf of a child described in section 101(b)(1)(F) of the act), and decisions on requests for revalidation and decisions revoking the approval of such petitions in accordance with section 205 of the act, as provided in Parts 204 and 205, respectively, of this chapter.
 (6) Decisions on applications for the exercise of the discretionary authority contained in section 212(d)(3) of the act as provided in Part 212 of this chapter.
 (7) Determinations relating to bond, parole, or detention of an alien as provided in Part 242 of this chapter.
 (8) Decisions of special inquiry officers in rescission of adjustment of status cases, as provided in Part 246 of this chapter.
 
 
 [8]
 C.F.R. § 3.1(b) (1978)
 
 
 [28]
 "(I)n considering and determining cases before it ... the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case." 8 C.F.R. § 3.1(d)(1) (1978). See 1 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 1.10e, at 1-75 (1981)
 
 
 [29]
 Having established that even illegal aliens within this country have a liberty interest protectible under the due process clause of the fifth amendment, 503 F.Supp. at 455, the district court looked to the federal regulations and Operations Instructions governing asylum claims to determine what process the plaintiffs were due. It went on to state that these procedures "clearly provide a good foundation for procedural due process even if they do not necessarily exhaust the requirements of due process or are not explicitly required by the Constitution," id. at 456, and to suggest that departure from these procedures, "especially if willful, systematic, and cumulative, may amount to breach of the fundamental fairness which due process guarantees." Id. at 455 (citation omitted). While not explicitly doing so, the court came very close to equating violations of INS regulations and operating procedures with denials of procedural due process. But see United States v. Floulis, 457 F.Supp. 1350, 1354 (W.D.Pa.1978) ("(W)e do not believe that the failure of the INS to comply with its regulations constitutes a per se denial of due process rendering the deportation proceedings constitutionally defective .... The contours of the due process clause are too deeply rooted in lasting constitutional principles to depend upon administrative regulations for the specific protections the clause affords. What is 'fundamentally fair' ... cannot vary each time the Attorney General amends the immigrations regulations."); Arnett v. Kennedy, 416 U.S. 134, 166-67, 94 S.Ct. 1633, 1650, 40 L.Ed.2d 15 (Powell, J., concurring in part) (objecting to the plurality's conclusion "that the statute governing federal employment determines not only the nature of appellee's property interest, but also the extent of the procedural protections to which he may lay claim" on the ground that "the adequacy of statutory procedures for deprivation of a statutorily created property interest must be analyzed in constitutional terms")
 
 
 [30]
 Supreme Court cases involving due process challenges in the deportation context have frequently stated or assumed that a liberty interest in the literal sense of an alien's right to be and remain in the United States is affected by deportation proceedings. As far back as The Japanese Immigrant Case, we read:
 (T)his court has never held, nor must we now be understood as holding, that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in "due process of law" as understood at the time of the adoption of the Constitution. One of these principles is that no person shall be deprived of his liberty without opportunity, at some time, to be heard, before such officers, in respect of the matters upon which that liberty depends ....
 189 U.S. 86, 100-01, 23 S.Ct. 611, 614, 47 L.Ed. 721 (1903) (emphasis added). Again in Bridges v. Wixon, 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945), a challenge by petition for writ of habeas corpus to the legality of a deportation order based on a finding that the alien was a member of and affiliated with the Communist Party, the Court affirmed: "Here the liberty of an individual is at stake .... Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." And in Wong Yang Sung v. McGrath, 339 U.S. 33, 50, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1950), there is the recognition that "(a) deportation hearing involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned, perhaps to life itself."
 These cases broadly suggest that the nature of the private interest affected by deportation is encompassed in the concept of "liberty" as that term is used in the due process clause. Hence the Constitution itself is suggested to be the source of the interest of which an alien may not be deprived without procedural protections. These cases also seem to imply that this liberty interest is implicated in the context of asylum proceedings. We need not so decide, however; for while we find that procedural protections apply in this context, we conclude that Congress through delegation has defined a private interest triggering due process safeguards.
 At least two commentators have suggested a constitutionally-based liberty interest besides the "core" liberty interest discussed in the Supreme Court deportation cases. Professor William Van Alstyne has argued that "liberty" as used in the due process clause should be defined to include freedom from arbitrary adjudicative procedures or freedom from governmental adjudication of individual claims by unreliable means. Van Alstyne, Cracks in "The New Property": Adjudicative Due Process in the Administrative State, 62 Cornell L.Rev. 445, 487 (1977). Professor Laurence Tribe has also endorsed this notion-albeit with modifications to emphasize (1) not merely the importance of eliminating the risk of erroneous government determinations, but also the importance of individual participation in government action that focuses on and adversely affects that individual, and (2) the importance of due process safeguards not only in the narrow context of adjudication but whenever the government singles out particular persons for deprivation. L. Tribe, American Constitutional Law § 10-13, at 538-39 (1978).
 As Professor Van Alstyne acknowledges, however, the Supreme Court's current mode of analysis in procedural due process cases forecloses recognition of a substantive entitlement to freedom from governmental procedural arbitrariness. See Van Alstyne, supra, at 489. For now at least, an individual has no constitutional freedom from fundamentally unfair modes of government action, the threatened deprivation of which would trigger procedural due process protections.
 
 
 [31]
 See, e.g., Meachum v. Fano, 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976) (no state-created right against transfers between prisons); Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (no state-created property interest in continued employment as policeman); Goss v. Lopez, 419 U.S. 565, 572-73, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975) (state-created entitlement to public education); Wolff v. McDonnell, 418 U.S. 539, 577, 94 S.Ct. 2963, 2985, 41 L.Ed.2d 935 (1974) (state-created right to prisoner good-time credit); Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (no state-created property interest in re-employment as state university teacher); Morrissey v. Brewer, 408 U.S. 471, 482, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (state-created liberty interest in revocation of parole only on certain conditions); Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287 (1970) (federally-created property interest in continued receipt of welfare benefits)
 
 
 [32]
 8 C.F.R. §§ 108.1, 108.2 (1978)
 
 
 [33]
 8 U.S.C. § 1103(a), (b) (1976)
 
 
 [34]
 See note 8 supra
 
 
 [35]
 Both the statute authorizing the Attorney General to withhold deportation, 8 U.S.C. § 1253(h), and the regulations permitting district director action on asylum claims, 8 C.F.R. § 108, refer to the discretionary nature of the decision to grant the requested relief. (We note in passing, however, that Congress recently amended the language of 8 U.S.C. § 1253(h) to include a flat prohibition on deportation of an alien to a country where his life or freedom would be threatened "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h) (Supp. IV 1980), Pub.L.No.96-212, Title II § 203(e), 94 Stat. 107 (amending 8 U.S.C. § 1253(h) (1976)). We do not speculate on the effect of this amendment, if any, on the interest we find protected here.) In addition, this court has held that the Protocol does not remove any discretion from the INS in making an asylum determination and does not vest the alien with a liberty interest protected under the due process clause. Pierre v. United States, 547 F.2d 1281, 1287 (5th Cir. 1977). Our holding today does not conflict with the decision in Pierre, for we do not find that a substantive right to asylum arises directly from the Protocol. Nor do we find that the right to petition for asylum arises directly by operation of the Protocol. Rather, the Protocol provides the policy backdrop against which the INS, exercising its congressionally delegated authority, promulgated regulations establishing an avenue to petition for asylum. Cf. Coriolan v. INS, 559 F.2d 993, 996 (5th Cir. 1977) (Attorney General's broad discretion to withhold deportation under 8 U.S.C. § 1253(h) must be measured in light of the Protocol)
 
 
 [36]
 See Pierre v. United States, 547 F.2d 1281 (5th Cir. 1977)
 
 
 [37]
 Compare the right of the people to petition the government for redress of grievances. U.S.Const. amend. I. This right likewise carries with it no guarantee of securing the substantive relief sought
 
 
 [38]
 Cf. Hampton v. Mow Sun Wong, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976) (alien has protected "liberty" interest in at least being considered for federal civil service employment)
 
 
 [39]
 Our recognition of a protected right to petition should not be construed as converting procedural due process into an independent constitutional right. As we have indicated elsewhere, the due process guarantee is not applicable until some protected interest has been identified. Nor are we subscribing to the views advanced by Professors Van Alstyne and Tribe, see note 30 supra, that "liberty" as used in the due process clause encompasses a personal freedom from governmental procedural arbitrariness. Our conclusion is one step removed from their analysis. While they argue that the Constitution itself should be interpreted as creating this freedom, we have identified only an entitlement created by the federal government. Whether that entitlement could be eliminated without violating constitutional limitations is a question upon which we do not pass
 
 
 [40]
 Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976)
 
 
 [41]
 We deem it premature at this point to dictate the precise content of the procedures which would be constitutionally required. The government should be given the opportunity to submit a detailed reprocessing plan and the district court the first opportunity to assess its constitutional sufficiency
 
 
 [42]
 We wish to emphasize that our holding does not imply that an immigration official cannot act unless and until the alien has provided sufficient information providing a basis for decision. The alien may be required to comply with reasonable filing deadlines
 
 
 [43]
 In this case we find particularly appropriate the notion that while justice delayed may be justice denied, prompt injustice is not the answer
 
 
 [44]
 As noted in part IA supra, under INS operating procedures the hearing officer also must insure that all of the Form I-589 questions are answered and that the claimant has no additional facts to present. O.I. 108.1(a)
 
 
 [45]
 8 C.F.R. § 108.2 (1978); O.I. 108.1(a)
 
 
 [46]
 8 C.F.R. § 108.2 (1978)
 
 
 [47]
 This is especially so in light of the fact that the administrative burden entailed in processing large numbers of cases is chiefly a problem of the INS' own creation. See note 11 supra & accompanying text
 
 
 [48]
 Completely apart from the question of any constitutional violation brought to the district court under its general federal question jurisdiction, we conclude that the district court properly exercised its jurisdiction under 8 U.S.C. § 1329 to order the government to submit a reprocessing plan which adheres to INS regulations and operating procedures. Whether or not these procedures are mandated by the due process guarantee, it is clear at least that agency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the court. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267, 74 S.Ct. 499, 503, 98 L.Ed. 681 (1954); see United States v. Nixon, 418 U.S. 683, 695-96, 94 S.Ct. 3090, 3100-01, 41 L.Ed.2d 1039 (1974); Mendez v. INS, 563 F.2d 956, 959 (9th Cir. 1977); Yee Dai Shek v. INS, 541 F.2d 1067, 1069 (4th Cir. 1976)
 The district court expressly found that the actions alleged in counts 1, 2, 4, 6 and 7 constituted violations of INS regulations and operating procedures. Specifically, the court determined the following practices to be deviations from agency regulations and procedure: failure to suspend deportation hearings when an asylum claim is advanced, 503 F.Supp. at 520; the setting of ten-day time limits for filing asylum applications, id. at 521-22; conducting asylum interviews in such an arbitrary and oppressive manner as to prevent full presentation of the asylum claim, id. at 526; and failure to allow access to prior asylum decisions and to nonrecord material upon which INS relied, id. at 530. These findings are not clearly erroneous. Hence, the government's plan for reprocessing must correct these errors.
 
 
 [49]
 Because we dispose of this issue on relevancy grounds, we do not reach the other argument advanced by the government-namely, that the district judge improperly treaded upon the foreign policy power vested exclusively in the executive branch
 
 
 [50]
 See note 23 supra
 
 
 [51]
 See part V supra