Dan Marius ANDREIU, Petitioner,

v.

Janet RENO, Attorney General, Respondent.

No. 99–70274.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 23, 2000.*

Filed Sept. 8, 2000.

---

\* This matter came before a duly-constituted motions panel without oral argument. The motions panel decided that oral argument was necessary and ordered supplemental briefing on the applicability of 8 U.S.C. § 1252(f)(2) on motions for a stay of removal.

Linton Joaquin, National Immigration Law Center, Los Angeles, California, for the petitioner.

Mark C. Walters (argued), Linda S. Wernery, Department of Justice, Washington, D.C., for the respondent.

Before: BEEZER, O'SCANNLAIN and THOMAS, Circuit Judges.

Opinion by Judge BEEZER; Dissent by Judge THOMAS.

BEEZER, Circuit Judge:

Dan Marius Andreiu moves for a stay of the Board of Immigration Appeal's ("BIA") final order of removal, pending our resolution of his petition for review. The government opposes the motion because Andreiu is unable to satisfy the standard for enjoining an alien's removal under 8 U.S.C. § 1252(f)(2) (Supp. II 1996). Andreiu argues that section 1252(f)(2) does not apply to temporary stays. A motions panel of this court requested supplemental memoranda on "the applicability, if any, of 8 U.S.C. [§] 1252(f) to petitioner's motion for a stay of removal." We have jurisdiction pursuant to 8 U.S.C. § 1252, and we hold that section 1252(f)(2) applies to temporary stays.

## I

Andreiu is a native of Romania, where he was a member of the National Liberation Party. During the revolution that began in 1989, Andreiu tried to open a radio station that would broadcast the party's views. Andreiu testified that, as a result of his political activity, a group allied with the government threatened to kill him and tried to hit him with an automobile.

Andreiu escaped to Paris, where he sent an insulting postcard to the person that he believed tried to murder him. After obtaining French, German and Austrian visas, Andreiu immigrated to the United States in 1991. On September 10, 1997, the Immigration and Naturalization Service ("INS") sent Andreiu a "Notice to Appear" to answer the charge of remaining in the United States longer than permitted. See 8 U.S.C. § 1227(a)(1)(B) (Supp. II 1996). Andreiu subsequently applied for asylum.

On February 2, 1998, an immigration judge denied the asylum claim because Andreiu's testimony was not credible. The credibility determination was based on the immigration judge's conclusion that Andreiu's description of events was implausible. Although the BIA found that Andreiu's testimony was consistent and reversed the negative credibility determination, it affirmed the denial of asylum on February 26, 1999. The BIA concluded that Andreiu failed to establish a well-founded fear of persecution, or a clear probability of persecution, because he did not produce documentary evidence that he was a member of the National Liberation Party or that people associated with the

Romanian government threatened to kill him. Because the evidence did not establish an objectively reasonable fear of persecution, and because the State Department cited Romania as a constitutional democracy that respects human rights, the BIA decided that asylum was inappropriate.

Andreiu filed a petition for review with this court and requested a stay of his removal. In the motion for a stay, Andreiu argued that he was detained by the INS during the proceedings before the immigration judge and was prevented from obtaining documentary evidence. Andreiu asserted also that the BIA's requirement that he produce evidence to support his credible testimony is contrary to the rule that objective evidence of a well-founded fear of persecution "may be satisfied by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant." *Singh v. Ilchert*, 63 F.3d 1501, 1506 (9th Cir.1995) (internal quotation marks omitted).

On March 15, 1999, we temporarily stayed Andreiu's removal pursuant to *De Leon v. INS*, 115 F.3d 643 (9th Cir.1997). We subsequently appointed pro bono counsel and requested additional briefing on section 1252(f)(2)'s applicability to a stay of removal pending resolution of a petition for review.

## II

Prior to the September 30, 1996 enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009–546 (1996), stays of removal were generally automatic. *See* 8 U.S.C. § 1105a(a)(3) (1994) ("The service of the petition for review ... shall stay the deportation of the alien pending determination of the petition by the court, unless the court otherwise directs or unless the alien is convicted of an aggravated felony ...."), *repealed by* 8 U.S.C. § 1252(b)(3)(B). The grant of automatic stays ended with the passage of IIRIRA, which "dramatically altered this court's

jurisdiction to review final deportation and exclusion orders." *Kalaw v. INS*, 133 F.3d 1147, 1149 (9th Cir.1997).

The new standards of review became effective on April 1, 1997. *See* Pub.L. 104–208, § 309(a), 110 Stat. 3009–625; *Kalaw*, 133 F.3d at 1149–50. IIRIRA, however, applied special "transitional rules" to "cases in which a final deportation or exclusion order was filed after October 30, 1996, and which were pending before April 1, 1997." *Kalaw*, 133 F.3d at 1150; *see* Pub.L. 104–208, § 309(c), 110 Stat. 3009–625 to –627. Under the transitional rules, aliens encountered IIRIRA's elimination of the automatic stay: "Service of the petition [for review of an order of removal] ... does not stay the removal of an alien pending the court's decision on the petition, unless the court orders otherwise." 8 U.S.C. § 1252(b)(3)(B); *see* Pub.L. 104–208, § 309(c)(4)(F), 110 Stat. 3009–626 (applying discretionary stay to transitional cases).

Pursuant to our discretion under the transitional rules, we held that "[t]he filing of a motion for a stay or a request for a stay contained in a petition for review will stay a petitioner's deportation temporarily until the court rules on the stay motion." *De Leon*, 115 F.3d at 644. When reviewing the merits of a discretionary stay request, we required the petitioner to "show either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor." *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir.1998) (applying preliminary injunction standard).

Because Andreiu's removal proceedings began after April 1, 1997, the transitional rules do not apply to his stay request. *See* Pub.L. 104–208, § 309(c)(4), 110 Stat. 3009–626; *Kalaw*, 133 F.3d at 1150. We must therefore determine the standard under which IIRIRA's permanent rules allow us to grant a stay of removal.

## III

The government argues that IIRIRA changed the standard for granting stays, and now requires that "no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2). Andreiu contends that section 1252(f)(2) does not apply to stay requests because it addresses only actions collateral to the petition for review process, and that we should review his motion under the traditional discretionary stay test, *see Abbassi,* 143 F.3d at 514.

To determine whether section 1252(f)(2) applies to stays, "we must first look to the statutory language: 'The starting point in interpreting a statute is its language, for if the intent of Congress is clear, that is the end of the matter.'" *United States v. Morales–Alejo,* 193 F.3d 1102, 1105 (9th Cir.1999) (quoting *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 409, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) (internal citations and quotations omitted)). In interpreting the statute, we are mindful of "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Similarly, "we should not construe a statute to displace courts' traditional equitable authority absent the 'clearest command,' or an 'inescapable inference' to the contrary." *Miller v. French,* —— U.S. ——, 120 S.Ct. 2246, 2254–55, 147 L.Ed.2d 326 (2000) (internal citations omitted).

Section 1252(f)(2) limits a court's power to "enjoin the removal of any alien." At issue is whether section 1252(f)(2)'s use of the word "enjoin" encompasses the temporary stay of an alien's removal. We hold that it does.

"Enjoin" is defined as: "To legally prohibit or restrain by injunction." Black's Law Dictionary 550 (7th ed.1999); *see also id.* at 788 (defining "injunction" as "[a] court order commanding or preventing an action"). "Stay" is "[t]he postponement or halting of a proceeding, judgment, or the like." *Id.* at 1425. These definitions show that the plain meaning of "enjoin" includes the grant of a "stay."

The common use of "enjoin" and "stay" also demonstrate that they are not mutually exclusive. Courts often use these terms interchangeably or to indicate that "enjoin" encompasses "stay." *See, e.g., NLRB v. Nash–Finch Co.,* 404 U.S. 138, 139–41, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971) (holding that the NLRB's attempt to *"enjoin"* or *"restrain"* a state court injunction fell under the exception of 28 U.S.C. § 2283: "A court of the United States may not grant an *injunction* to *stay* proceedings in a State court except as expressly authorized by . . . Congress . . . .") (emphasis added); *Gruntz v. County of Los Angeles (In re Gruntz),* 202 F.3d 1074, 1087 (9th Cir.2000) (en banc) (holding that "Congress did not intend the [bankruptcy] *stay* to *enjoin* all state criminal proceedings automatically") (emphasis added); *Pacific Reinsurance Management Corp. v. Ohio Reinsurance Corp.,* 935 F.2d 1019, 1022 (9th Cir.1991) (applying statute that proscribes appeals from an interlocutory order "refusing to *enjoin* an arbitration" to an appeal from a court's "denial of a *stay* of arbitration") (emphasis added). Motions for a temporary stay have also long been reviewed under the same standard as motions for a preliminary injunction. *See, e.g., Coleman v. PACCAR, Inc.,* 424 U.S. 1301, 1305, 96 S.Ct. 845, 47 L.Ed.2d 67 (Rehnquist, Circuit Justice 1976) ("A court staying the action of . . . an administrative agency must take into account factors such as irreparable harm and probability of success on the merits.") (internal citations omitted); *Abbassi,* 143 F.3d at 514 ("We evaluate stay requests under the same standards employed by district courts in evaluating motions for preliminary injunctive relief") (citing *Lopez v. Heckler,* 713 F.2d 1432, 1435 (9th Cir.), *reversed in part on other grounds,* 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (Rehnquist, Circuit Justice 1983)).

Andreiu argues that, under IIRIRA, "enjoin" applies only to permanent injunctions. Section 1252(f)(1) eliminates courts' (other than the Supreme Court) jurisdiction "to enjoin or restrain the operation of the provisions of part IV of this subchapter." Under Andreiu's construction, section 1252(f)(1) demonstrates that Congress intended to define "restrain" as applying only to temporary orders and to define "enjoin" as referring solely to permanent relief. Andreiu also notes that Congress's use of "enjoin" and "restrain" has differed in other acts. *Compare* 28 U.S.C. § 2349(a) (declaring that courts of appeal may *"enjoin* [ ], set[ ] aside, or suspend[ ], in whole or part, the order of an agency") (emphasis added), *with id.* section 2349(b) (stating that "[t]he filing of the petition for review does not of itself *stay* or suspend the operation of the order of the agency, but the court of appeals in its discretion may *restrain* or suspend, in whole or in part, the operation of the order. . . . The court of appeals, at the time of hearing the application for an interlocutory *injunction* . . . may continue the temporary *stay* or suspension . . . .") (emphasis added).

Although in section 1252(f)(1), "enjoin" and "restrain" apply to a wide variety of actions, the use of "enjoin" in section 1252(f)(2) relates solely to an alien's removal. *Compare* 8 U.S.C. § 1252(f)(1) (stating that no court, other than the Supreme Court, shall "enjoin or restrain the operation of the provisions of part IV of this subchapter[, 8 U.S.C. §§ 1221-1231 (Supp. II 1996) (addressing inspection, apprehension, examination, exclusion and removal) ]"), *with id.* at section 1252(f)(2) (stating that "no court shall enjoin the removal of any alien"). Nothing in section 1252(f)(1) indicates that "restrain" applies exclusively to temporary orders or that "enjoin" is constrained to permanent relief. These terms pertain to the operation of different immigration provisions; thus, the failure to use "restrain" in section 1252(f)(2) shows that the term does not refer to removals, not that it is limited to temporary relief or that it constitutes improper surplusage, *see Ratzlaf v. United States,* 510 U.S. 135, 140, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("Judges should hesitate . . . to treat statutory terms [as surplusage] in any setting. . . ."); *Cardoza–Fonseca,* 480 U.S. at 432, 107 S.Ct. 1207 ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and alteration omitted).

Similarly, other Congressional uses of "enjoin" and "restrain" do not support Andreiu's interpretation. *See, e.g.,* 28 U.S.C. § 2349(a), (b). The assertion that Congress used "enjoin" only in relation to permanent orders is contrary to the plain meaning of that word. *See, e.g., Miller,* 120 S.Ct. 2246, 2251–52 (noting motion "for a *temporary* restraining order or *preliminary* injunction to *enjoin* the operation of the automatic stay") (emphasis added). Indeed, Andreiu suggests that we review stay requests under the preliminary injunction standard, which is an example of a court's power to temporarily enjoin. *See* Black's Law Dictionary 550 (stating that to "enjoin" is to "restrain by injunction"); *id.* at 788 (defining "preliminary injunction" as a "temporary injunction"). We are not convinced that section 1252(f)(1), or any other act, counters our interpretation of "enjoin." *Accord Song v. INS,* 82 F.Supp.2d 1121, 1130 (C.D.Ca.2000) (holding in habeas proceeding that "[b]y its terms, the IIRIRA standard [under section 1252(f)(2) ] clearly applies because Petitioner seeks a stay of deportation."); *Hypolite v. Blackman,* 57 F.Supp.2d 128, 132 (M.D.Pa.1999) (holding in habeas proceeding that section 1252(f)(2) applies to a stay motion); *Naidoo v. INS,* 39 F.Supp.2d 755, 762 (W.D.La.1999) (same).

█ The definitions of "enjoin" and "stay," in addition to courts' ordinary use of the terms, indicate that the plain meaning of "enjoin" includes the grant of a temporary stay. We therefore hold that section 1252(f)(2)'s limit on the power of

courts to "enjoin" the removal of an alien clearly applies to the stay of a removal order pending resolution of a petition for review.

## IV

Although our analysis should end with the conclusion that statutory language clearly demonstrates Congress's intent to apply section 1252(f)(2) to temporary stays, *see Morales–Alejo*, 193 F.3d at 1105, we address Andreiu's further assertions to the contrary. In particular, Andreiu argues that the structure of section 1252(f) precludes the application of section 1252(f)(2) to stays.

The Supreme Court held that section 1252(f)(1) limits "classwide injunctive relief against the operation of sections 1221–1231, but specifies that this ban does not extend to individual cases." *Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 481–82, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); *see also* 8 U.S.C. § 1252(f)(1) ("[N]o court (other than the Supreme Court) shall have jurisdiction ... to enjoin or restrain the operation of [sections 1221 to 1231] ... other than with respect to the application of such provisions to an individual alien....."). Section 1252(f)(1), according to Andreiu, addresses only collateral review for class actions; therefore, we should interpret section 1252(f)(2) as limiting only collateral injunctive relief for individuals.

Even if we agreed that section 1252(f)(1) applies only to collateral review—and we do not address that issue here—we see nothing in the statutory language suggesting that section 1252(f)(2) implicates only collateral matters. Section 1252(f)(2) limits a court's power to "enjoin the removal of any alien pursuant to a final order under this section." "Section" refers to the whole of section 1252, which implicates direct judicial review of orders of removal, not merely subsection 1252(f). *See American–Arab*, 525 U.S. at 487, 119 S.Ct. 936 (holding that section 1252(g)'s reference to "this section" refers to the entirety of section 1252). Moreover, a BIA decision is a "final order" of removal. *See* 8 U.S.C.

§ 1101(a)(47)(B)(i) (Supp. II 1996). Because Andreiu moves that we stay, i.e., "enjoin," his removal pursuant to a final order pending resolution of his petition for review, section 1252(f)(2) applies.

Andreiu argues also that section 1252(f)(2) would improperly require a higher standard to obtain a stay of removal than to succeed on the merits of a petition for review, *see* 8 U.S.C. § 1252(b)(4) (stating in part that "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary, ... [and] a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law"). Even if we assume that Andreiu's characterization of the standards is correct, applying a higher standard on motions for a stay is not inconsistent or superfluous. *See Ratzlaf*, 510 U.S. at 140, 114 S.Ct. 655.

IIRIRA "introduced sweeping changes into our immigration laws." *Kalaw*, 133 F.3d at 1149. One of these changes was to allow the review of an alien's petition for review even if the alien is no longer in the country. *See* 8 U.S.C. § 1252(b)(3)(B) (replacing 8 U.S.C. § 1105a(c)). Increasing the burden needed to stay a removal order is consistent with IIRIRA's intent "to vest the BIA with final appellate jurisdiction for most INS deportation proceedings." *Kalaw*, 133 F.3d at 1149; *see also American–Arab*, 525 U.S. at 486, 119 S.Ct. 936 ("*[M]any* provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation.") (emphasis in original). Congress has made clear its desire to expedite removal proceedings and has even foreseen the possibility that an alien with a meritorious petition for review may be removed from the country before a court grants the petition. The section 1252(f)(2) standard, although it may be severe as applied to temporary stays, is consistent with the provisions and policy goals of IIRIRA.

Andreiu contends as well that applying section 1252(f)(2) to stays inappropriately compels the court to engage in a full review of the merits. This argument is unpersuasive. The need to examine the merits of a petition for review will often exist under both the standard of section 1252(f)(2) and the preliminary injunction standard that Andreiu advances. *See Abbassi*, 143 F.3d at 514 (requiring the alien to "show either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor").

We also find unconvincing Andreiu's assertion that the structure of section 1252 precludes application of section 1252(f)(2) to stays. Andreiu notes that section 1252(a)(1) declares that "[j]udicial review of a final order of removal ... is governed only by [the Hobbs Act, 28 U.S.C. §§ 2341–2351 (providing courts of appeal with exclusive jurisdiction over certain administrative decisions),] except as provided in subsection (b) of this section." Section 1252(b)(3)(B) eliminates the automatic stay provision, but provides no standard for granting a discretionary stay. According to Andreiu, section 1252(a)(1) indicates that section 1252(f)(2) applies only to collateral review because Congress would have situated a new standard for temporary stays in section 1252(b).

Although the lucidity of section 1252(a)(1) would have benefitted from the placement of the stay standard in section 1252(b), Congress's failure to do so is not paramount. Section 1252(f)(2) explicitly states that it applies "[n]otwithstanding any other provision of law." Moreover, sections 1252(c) and (d) govern judicial review of petitions for review. The structure of section 1252, therefore, does not require that section 1252(b) act as the sole provision related to petitions for review and does not gainsay our conclusion that section 1252(f)(2) clearly applies to the grant of a temporary stay. *Cf. Maldonado v. Fasano*, 67 F.Supp.2d 1170, 1175 (S.D.Cal.1999) (stating that section 1252(f)(2) "appears to displace" the pre-IIRIRA stay standard).

We hold that section 1252(f)(2) applies to an alien's motion to stay a final removal order pending resolution of a petition for review.

V

Under section 1252(f)(2), we cannot stay a final order of removal "unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." We must now determine what this standard requires.

"Phrases such as 'clear and convincing,' 'clear, cogent, and convincing,' and 'clear, unequivocal, and convincing' have all been used to require a plaintiff to prove his case to a higher probability than is required by the preponderance-of-the-evidence standard." *California ex rel. Cooper v. Mitchell Bros.' Santa Ana Theater*, 454 U.S. 90, 93 n. 6, 102 S.Ct. 172, 70 L.Ed.2d 262 (1981). Similarly, we have held that "the 'clear and convincing' burden is not the same as proof beyond a reasonable doubt.... [A]fter discussing the preponderance of the evidence and beyond a reasonable doubt standards, the [Supreme] Court referred to the clear and convincing standard as 'an intermediate standard of proof.'" *United States v. Meza–Soria*, 935 F.2d 166, 169 (9th Cir.1991) (quoting *Santosky v. Kramer*, 455 U.S. 745, 756, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)); *see also* Black's Law Dictionary 577 (stating that clear and convincing evidence "indicat[es] that the thing to be proved is highly probable or reasonably certain. This is a greater burden than preponderance of the evidence, ... but less than evidence beyond a reasonable doubt....").

■ With respect to factual challenges, section 1252(f)(2) requires that the alien show by clear and convincing evidence that the removal order was based on an erroneous finding of fact. We have difficulty, however, in applying this standard to legal

questions because "clear and convincing evidence" speaks only to factual issues. *See, e.g., California ex rel. Cooper,* 454 U.S. at 92–93, 102 S.Ct. 172 (stating that standards of proof such as "clear and convincing" instruct "the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication") (internal citation and quotation marks omitted); Black's Law Dictionary 576 (defining "evidence" as something "that tends to prove or disprove the existence of an alleged fact"). Section 1252(f)(2)'s imposition of a factual standard of proof compels us to establish a standard of review for legal issues that best reflects Congress's intent.

■ Congress's mandate that "clear and convincing evidence" show that the removal order "is prohibited as a matter of law" informs our analysis. Section 1252(f)(2) significantly heightens the burden placed on an alien requesting a stay; thus, our normal de novo review of legal conclusions is inappropriate. Rather, with respect to questions of law, we believe that the standard of review that best adheres to the language of section 1252(f)(2) is that we will not stay a final removal order unless the alien establishes that the order was "manifestly contrary to law."

■ Although the phrase "manifestly contrary to law" is not well-established, its terms are familiar. "Manifest" describes something that is apparent, clear, indisputable, obvious or plain. *See, e.g., Dickinson v. Zurko,* 527 U.S. 150, 155, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (stating that "manifest error," "clear case of error" and "clearly wrong" are terms that "might be thought to mean the same thing"); Webster's Third New International Dictionary 1375 (1993) (defining "manifest" as, *inter alia,* "capable of being easily understood or recognized at once by the mind: not obscure: obvious"); Black's Law Dictionary 563 (defining "manifest error" as "[a]n error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record"); *id.* at 814 (defining "manifest intent" as "[i]ntent that is apparent or obvious"). "The term 'contrary to law' means contrary to any existing law." *Olais–Castro v. United States,* 416 F.2d 1155, 1158 n. 8 (9th Cir.1969) (citing *Callahan v. United States,* 285 U.S. 515, 517, 52 S.Ct. 454, 76 L.Ed. 914 (1932)). More specifically, "contrary" is defined as " 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams v. Taylor,* —— U.S. ——, ——, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000) (quoting Webster's Third New International Dictionary 495 (1976)). That we would reach a different legal conclusion is insufficient; to grant a stay under the "manifestly contrary to law" standard, we must hold that the removal order is clearly antithetical to an existing law.

We believe that Congress's requirement of "clear and convincing evidence" that a removal order is "prohibited as a matter of law" is best satisfied, with regard to legal issues, by requiring an alien to establish that a removal order was "manifestly contrary to law." This standard represents a legal approximation of "clear and convincing evidence" and furthers IIRIRA's goal of respecting the finality of BIA orders. *See* 8 U.S.C. § 1252(b)(4)(C), (D) (stating that eligibility decisions and the Attorney General's discretionary judgment to grant asylum are conclusive "unless manifestly contrary to law"); *American–Arab,* 525 U.S. at 486, 119 S.Ct. 936; *Kalaw,* 133 F.3d at 1149.

We hold that in order for us to stay the removal of an alien pursuant to a final order under section 1252, the alien must either: 1) show by clear and convincing evidence that the order was based on an erroneous finding of fact; or 2) establish that the order was manifestly contrary to law.

## VI

We do not grant Andreiu's motion for a stay because there is no showing that the BIA's order was based on an erroneous

finding of fact or that it was manifestly contrary to law. Because we interpret new law, this opinion will not prejudice a subsequent motion for a stay of Andreiu's removal, should he choose to file one.

MOTION FOR STAY DENIED.

THOMAS, Circuit Judge, dissenting:

The majority disposition is at odds with the plain language of 8 U.S.C. § 1252(f), the structure of § 1252 as a whole and asylum theory. The result is not trivial. Rather than preserving the status quo while our court considers the merits of a petition for review, the majority's ruling will permit the INS immediately to expel asylum-seekers to the very countries where they may have suffered brutal persecution. Under these circumstances, the consequences of removal may be not only "severe," but in many cases life-threatening, given the concerns that led Congress afford asylum to victims of persecution. *See* 8 Charles Gordon, Stanley Mailman & Stephen Yale–Loehr, Immigration Law and Procedure § 104.13[4][d][iii] (Rev. ed.2000). Further, limited access to courts in many countries, as well as the reluctance of persecuting governments to return successful asylum-seekers to the United States, will likely render any post-removal relief granted by our court moot.

Thus, I respectfully dissent.

I

The pivotal issue in this appeal is whether the terms "stay" and "enjoin" as used in 8 U.S.C. § 1252 are synonymous. They are not, either as a matter of general legal application or under the plain words of the statute.

A

As a matter of general federal law, the Supreme Court conclusively differentiated between the two concepts in *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988). In interpreting the terms as used in 8 U.S.C. § 1292(a)(2),[1] the Court observed:

> With the merger of law and equity, which was accomplished by the Federal Rules of Civil Procedure, the practice of describing these stays as injunctions lost all connection with the reality of the federal courts' procedural system.

485 U.S. at 283, 108 S.Ct. 1133; *see also Baltimore Contractors v. Bodinger,* 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955); Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3923 (1996).

Prior to *Gulfstream,* certain orders that stayed or refused to stay judicial proceedings were considered injunctions under the *Enelow–Ettelson* doctrine [2] and therefore

1. 28 U.S.C. § 1292(a)(1) provides, in pertinent part:

   [T]he courts of appeals shall have jurisdiction of appeals from ... [i]nterlocutory orders of the district court ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court ...

2. *See Ettelson v. Metropolitan Life Ins. Co.,* 317 U.S. 188, 63 S.Ct. 163, 87 L.Ed. 176 (1942); *Enelow v. New York Life Ins. Co.,* 293 U.S. 379, 55 S.Ct. 310, 79 L.Ed. 440 (1935). As explained in the Practice Commentary to 9 U.S.C. § 16:

   At common law, the court of chancery (equity), in which there was no jury, could enjoin a proceeding in a law court, in which the mode of trial was of course by jury. There was no vice-versa, however. A court of law could not enjoin the chancel-

lor. After the merger of the two systems, situations arose (and continue to) in which the plaintiff pleaded a law claim and the defendant interposed an equitable defense. When the trial court allowed the equitable defense to be tried first, and without a jury, incidentally staying the trial of the law claim until the equitable matter was resolved, *Enelow–Ettelson* held that this was in effect the granting of an "injunction" against a law action and therefore invoked § 1292(a)(1) to allow an immediate appeal from the injunction. It would not amount to an injunction, however, if the positions of the two matters were reversed—if the main claim was in equity, for example, and a "stay" of its trial was sought so as to let a legal counterclaim interposed by the defendant get tried first, and to a jury.

In that case, the order disposing of the "stay" would not then parallel a law court disposing of a request for an injunction

immediately appealable under § 1292(a)(1). *See Gulfstream*, 485 U.S. at 279, 108 S.Ct. 1133. In *Gulfstream*, however, the Supreme Court rejected the *Enelow–Ettelson* rule as a "sterile and antiquated doctrine" and held "that orders granting or denying stays of 'legal' proceedings on 'equitable' grounds are not automatically appealable under § 1292(a)(1)." *Gulfstream*, 485 U.S. at 287, 108 S.Ct. 1133.

Instead, *Gulfstream* first held that "[a]n order by a federal court that relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)."[3] *Id.* at 279, 108 S.Ct. 1133. The Supreme Court went on to hold that "[s]ection 1292(a)(1) will ... continue to provide appellate jurisdiction over orders that grant or deny injunctions and orders that have the practical effect of granting or denying injunctions and have 'serious, perhaps irreparable consequence.'" *Id.* at 287–88, 108 S.Ct. 1133 (quoting *Carson v. American Brands, Inc.*, 450 U.S. 79, 84, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981)) (internal quotations omitted).

Although *Gulfstream* addressed the appealability of stays and injunctions in a non-immigration context, it is useful in determining whether a stay of a final order of removal falls within the scope of the term "enjoin" in § 1252(f)(2). Application of the two-pronged *Gulfstream* test suggests that a stay of a removal order is not the equivalent of an injunction. First, a stay of removal order is "an order ... that relates only to the conduct or progress of litigation before [the] court." *See Gulf-*

*stream*, 485 U.S. at 279, 108 S.Ct. 1133. While such a stay may have substantive effect, the underlying removal order is essentially non-final pending the court's review of an alien's appeal. *See Butros v. INS*, 990 F.2d 1142, 1145 (9th Cir.1993) ("when appellate review exists, what looks like a final status can well turn out not to be a final status"); *Matter of Lok*, 18 I & N Dec. 101, 107 (BIA 1981) ("In those relatively rare instances where the court [of appeals] determines that the [BIA] erred, as a matter of fact or law, with respect to its deportability finding, reversal of the [BIA]'s order of deportation *nullifies* the order and restores the alien's lawful permanent resident status.") (emphasis added). The stay order therefore acts merely to preserve the *status quo* of the litigation, rather than acting to restrain an action by the INS independent of the instant proceedings. Moreover, despite the "practical effect" of restraining the INS from executing Andreiu's removal order, the INS cannot show that a stay of the removal order will have a "serious, perhaps irreparable consequence" upon it until Andreiu's claims on the merits are resolved by the court. *See Carson*, 450 U.S. at 84, 101 S.Ct. 993 (quoting *Baltimore Contractors*, 348 U.S. at 181, 75 S.Ct. 249).

Justice Rehnquist subsequently confirmed the distinction between stays and injunctions in *Coleman v. PACCAR, Inc.*, cited to by the majority:

> A court staying the action of a lower court or administrative agency must take into account factors such as irreparable harm and probability of success on

against chancery because there was no such thing at common law.
David D. Siegel, "Appeals from Arbitrability Determinations", Practice Commentary to 9 U.S.C. § 16.

**3.** *Gulfstream*, which involved a stay pending resolution of state court litigation under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), held that the stay at issue could not be considered an injunction absent

the *Enelow–Ettelson* rule because it related only to the conduct of litigation before the district court and did not affect the substantive issues of the case. *See* 485 U.S. at 281–82, 288, 108 S.Ct. 1133; *see also Abernathy v. Southern California Edison*, 885 F.2d 525, 528 (9th Cir.1989) ("definition of injunction does not include restraints or directions in orders concerning the conduct of the parties or their counsel, unrelated to the substantive issues in the action, while awaiting trial.") (internal citations omitted).

the merits. But in the absence of a statute,. rule or controlling precedent there is no fixed requirement that a court recite the fact that it has taken these into consideration, or explain its reasons for taking the action which it did.

424 U.S. 1301, 1305, 96 S.Ct. 845, 47 L.Ed.2d 67 (internal citations omitted). In doing so, Justice Rehnquist rejected the contention of the Secretary of Transportation that a stay issued by the court of appeals is equivalent to a preliminary injunction issued by the district court and must be governed by Federal Rule of Civil Procedure 65, which governs injunctions.[4] *See id.*

### B

The general distinction drawn by the Supreme Court in *Gulfstream* continues into the immigration statutes. "To determine the plain meaning of a statutory provision, we examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Children's Hosp. and Health Center v. Belshe,* 188 F.3d 1090, 1096 (9th Cir.1999). This approach is of great importance in interpreting the changes made to the Immigration and Nationality Act ("INA") through the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (1996), *as amended by* Act of Oct. 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656 (1996), and more specifically, in discerning the meaning of the various provisions of section 1252.

In *American–Arab,* for example, the Supreme Court interpreted narrowly the three actions listed in 8 U.S.C. § 1252(g) to apply "only to actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders'." 525 U.S. at 482, 119 S.Ct. 936. It rejected the notion that section 1252(g) "covers the universe of deportation claims—that it is a sort of 'zipper clause' that says 'no judicial review in deportation cases unless this section provides judicial review.'" *Id.* at 482, 119 S.Ct. 936.

In interpreting section 1252(g), the Supreme Court looked first to its history and the rationale for its enactment, as well as section 1252's structure as a whole. *See id.* at 483–86 & n. 9, 119 S.Ct. 936 ("[s]ection 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion"). It determined that Congress had "good reason" to focus on the three discrete events listed in the statute. *Id.* at 483, 119 S.Ct. 936. "At each stage the Executive

---

4. The majority's resort to analogous case analysis misses the mark. The majority cites *NLRB v. Nash–Finch Co.,* 404 U.S. 138, 139–41, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971), in which the Supreme Court addressed the scope of the Anti–Injunction Act, 28 U.S.C. § 2283, which generally prohibits the federal courts from interfering with state court proceedings except in certain narrow exceptions. The teaching sought by the majority cannot be derived from *Nash–Finch:* the Anti–Injunction Act "reflects fundamental principles of equity, comity, and federalism which normally counsel against federal interference with state judicial proceedings," *see Western Systems, Inc. v. Ulloa,* 958 F.2d 864, 868 (9th Cir.1992), and does not involve the ability of a court to exercise its equitable powers to stay the enforcement of a judgment that is being considered on appeal.

Similarly, the "automatic stay" in bankruptcy is a term of art defined under the Bankruptcy Code. *See* 11 U.S.C. § 362; *Gruntz v. County of Los Angeles (In re Gruntz),* 202 F.3d 1074, 1081–82 (9th Cir.2000) (en banc). Like the Anti–Injunction Act, the "automatic stay" in bankruptcy sweeps broadly and has the effect of enjoining of *any* judicial, administrative or other proceeding, including those in the state courts. *See id.* Congress specifically patterned procedure under the automatic stay "to the stages of an injunction in an ordinary civil case." *Elliott Associates v. Chateaugay Corp. (In re Chateaugay Corp.),* 880 F.2d 1509, 1512 (2d Cir.1989). Even in that context, the bankruptcy automatic stay is differentiated from a bankruptcy court-ordered injunction, which issues under 11 U.S.C. § 105. *See id.* at 1087 ("The bankruptcy court's injunctive power is not limited by the delineated exceptions to the automatic stay, nor confined to civil proceedings.").

has discretion to abandon the endeavor, and at the time IIRIRA was enacted the INS had been engaging in a regular practice (which had come to be known as 'deferred action') of exercising that discretion for humanitarian reasons or simply for its own convenience." *Id.* at 483–84, 119 S.Ct. 936. However, the "deferred action" policy had resulted in significant litigation from aliens for whom the INS refused to exercise "deferred action." Against this historical backdrop, the Supreme Court observed that "[s]ection 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations." *Id.* at 485, 119 S.Ct. 936.

A similar approach leads to the correct construction of section 1252(f)(2). Prior to IIRIRA's enactment, section 1105a(a) of the INA vested with the court of appeals the exclusive jurisdiction to review "all final orders of deportation ... made against aliens within the United States pursuant to administrative proceedings under [the pre-IIRIRA] section 1252(b) (deportation hearings) ..." 8 U.S.C. § 1105a(a) (1976) (repealed); *see also Haitian Refugee Center v. Smith,* 676 F.2d 1023, 1032 (5th Cir. Unit B 1982). Despite the placement by section 1105a(a) of review of final deportation orders exclusively with the court of appeals, this court, as well as the Supreme Court, recognized that not all challenges to INS actions were committed exclusively to the jurisdiction of the court of appeals. *See McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); *Montes v. Thornburgh,* 919 F.2d 531, 535–37 (9th Cir.1990); *see also Tefel v. Reno,* 180 F.3d 1286, 1296–97 (11th Cir.1999); *Smith,* 676 F.2d at 1033.

Rather, the governing view was that while the court of appeals "may have sole jurisdiction to review alleged procedural irregularities in an individual deportation hearing to the extent these irregularities may provide a basis for reversing an individual deportation," *Smith,* 676 F.2d at 1033, this exclusive grant of authority did not extend "to suits alleging a pattern or practice by immigration officials which violates the constitutional rights of a class of aliens." *Montes,* 919 F.2d at 535. The courts reasoned that the exclusive jurisdiction given the appellate courts under section 1105a(a) was distinguishable from "the authority of a district court to wield its equitable powers when a wholesale, carefully orchestrated, program of constitutional violations is alleged." *Smith,* 676 F.2d at 1033; *see also Montes,* 919 F.2d at 535.

While emphasizing that "the district court had no authority to rule on the merits of the underlying issue of deportability or entitlement to discretionary relief as to any individual," the district courts nonetheless "could provide declaratory and injunctive relief against a program violating constitutional rights." *Montes,* 919 F.2d at 535 (citing *Smith,* 676 F.2d at 1033 & n. 23). Under this rule, petitioners did not seek to set aside individual deportation orders. Instead, in numerous cases, aliens filed suit to obtain injunctive and declaratory relief, for example, to protect the rights of a class of asylum-seekers against procedures meant to clear a backlog of a class of asylum cases in *Montes,* to challenge on statutory and constitutional grounds the inclusion of a prohibition against employment in all bonds in *National Center for Immigrants Rights, Inc. v. INS,* 743 F.2d 1365, 1368–69 (9th Cir. 1984), and recently, to challenge the application of IIRIRA's continuous physical presence requirement, or "stop-time" provision, *see* 8 U.S.C. § 1229b(b) (1999), in *Tefel.*

These cases track the language of section 1252(f) and make clear that subsection (f)'s provisions were designed by Congress to prevent courts—except for the Supreme Court—from granting classwide injunctive and declaratory relief as a result of the new IIRIRA procedures pursuant to paragraph (f)(1), while preserving the ability of courts of appeals to grant injunctive relief in individual cases through paragraph (f)(2). *See* 8 Gordon, Mailman & Yale-

Loehr, Immigration Law and Procedure § 104.13[4][g][ii] (subsection (f) is a section that "relates to district court actions challenging policies and practices of the INS, the Justice Department's Executive Office for Immigration Review (EOIR), and other federal agencies that implement or enforce the [Immigration and Nationality Act]."). Such an interpretation comports with the Supreme Court's observation *in dictum* that section 1252(f) only "prohibits federal courts from granting classwide injunctive relief against the operation of sections 1221–1231, but specifies that this ban does not extend to individual cases." *American–Arab*, 525 U.S. at 481, 119 S.Ct. 936.

The relationship between paragraphs (f)(1) and (f)(2) is clearly embodied within the structure and headings of subsection (f) itself. While the general rule is that a section heading should not limit the plain meaning of the text, the titles of the subsection (f)'s paragraphs may be used "[f]or interpretative purposes" to "shed light on some ambiguous word or phrase." *Brotherhood of R.R. v. Baltimore & O.R. Co.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947) (citations omitted). Section 1252(f) is entitled "Limit on injunctive relief"; subsection (f)(1) falls under the heading "In general"; and finally, subsection (f)(2) is labeled as "Particular cases." Clearly, the juxtaposition of a broad paragraph—"In general"—next to a more specific, limited provision—"Particular cases"—establishes that paragraphs (f)(1) and (f)(2) are structurally related and that paragraph (f)(2) should be read in conjunction with paragraph (f)(1).

Section 1252(f)'s slender legislative history further confirms this construction: "single district courts or courts of appeal do not have authority to enjoin procedures established by Congress to reform the process of removing illegal aliens from the U.S." H.R.Rep. No. 104–469(I), 104th Cong., 2d Sess. 359, 473 (1996), *available in*, 1996 WL 168955 (1996). While IIRIRA section 306 is directed to "limit[ing] the authority of Federal court other than the Supreme Court to enjoin the operation of the new removal procedures established in this legislation":

> These limitations do not preclude challenges to the new procedures, but the procedures will remain in force while such lawsuits are pending. In addition, courts may issue injunctive relief pertaining to the case of an individual alien, and protect against any immediate violation of rights.

*See* H.R.Rep. No. 104–469(I), 104th Cong., 2d Sess. 359, 473 (1996), *available in*, 1996 WL 168955 (Mar. 4, 1996). In short, section 1252(f) was never intended to have the effect urged by the majority.

C

The evolution of the present stay provision, set forth at 8 U.S.C. § 1253(b)(3)(B), provides further evidence that the majority misinterprets section 1252(f)(2). Prior to IIRIRA's enactment, the filing of a petition for review automatically stayed a petitioner's deportation pending appellate review in most cases. *See De Leon v. INS*, 115 F.3d 643, 644 (9th Cir.1997) (citing 8 U.S.C. § 1105a(a)(3), repealed by IIRIRA § 306(b)).

Aliens convicted of an "aggravated felony" within the meaning of the INA, however, were not entitled to an automatic stay of deportation pending appeal. *See* 8 U.S.C. § 1105a(a)(3) (1995) (repealed); *Arthurs v. INS*, 959 F.2d 142, 143 (9th Cir. 1992). For these aliens, the court had the discretion to grant a request for a stay of deportation after evaluating the stay request under "the same standards employed by district courts in evaluating motions for preliminary injunctive relief." *Abbassi*, 143 F.3d at 514; *Artukovic v. Rison*, 784 F.2d 1354, 1355 (9th Cir.1986). This standard required an alien seeking a stay of deportation pending appeal to establish "either a probability of success on the merits and the possibility of irreparable injury, or that serious legal questions are raised and the balance of hardships tips sharply in petitioner's favor." *Id.* (citations omitted).

IIRIRA effected "sweeping changes" to this court's jurisdiction to review final deportation and exclusion orders. *Kalaw v. INS*, 133 F.3d 1147, 1149 (9th Cir.1997). The new law put in place permanent rules that apply to immigration proceedings—or "removal" proceedings—that were initiated against aliens such as Andreiu on or after April 1, 1997, with some exceptions. *See* IIRIRA § 309(a). However, for those aliens who were placed in deportation proceedings before April 1, 1997, and whose final orders of deportation were entered after October 30, 1996, Congress set forth specific transitional rules to govern these cases. *See* IIRIRA § 309(c); *Kalaw*, 133 F.3d at 1150.

These proceedings are governed by special "transitional changes in judicial review." *Id.* Among these changes, section 309(c)(4)(F) of IIRIRA reversed—in language nearly identical to that contained in the permanent rules—the old INA's presumption with respect to stays pending appeal: "service of the petition for review shall not stay the deportation of an alien pending the court's decision on the petition, unless the court orders otherwise ..." IIRIRA § 309(c)(4)(F); *see* 8 U.S.C. § 1252(b)(3)(B). Faced with the question of whether an alien had made the necessary showing under the transitional rules for a discretionary stay of deportation pending judicial review, the Seventh Circuit in *Sofinet v. INS*, 188 F.3d 703, 706 (7th Cir.1999), held that as in *Abbassi* the general criteria developed for stays or injunctions pending appeal under Federal Rules of Appellate Procedure 8 and 18 applied despite differences between a stay under the appellate rules and the stay procedure sanctioned under the INA.

Nothing in the permanent rules, including 8 U.S.C. § 1252(f)(2) changes the general U.S.C. § 1105a (1995) (repealed), which had under the old INA set forth the guidelines governing the court's jurisdiction over petitions for review. Judicial review of final removal orders is now—as before—governed by the Hobbs Act, chapter 158 of Title 28, except as provided in section 1252(b). *See* 8 U.S.C. § 1252(a)(1);

*compare* 8 U.S.C. § 1105a(a) (1995) (repealed). Section 1252(b), entitled "Requirements for review of orders of removal," provides general provisions for the review of removal orders, including rules of service, content of the petition for review, and scope and standard of review. *See generally* 8 U.S.C. § 1252(b).

As part of the changes made to the petition for review process, IIRIRA eliminated the automatic stay provision contained in the pre-INA § 1105a(a)(3), and replaced it with a provision similar to the stay provision applicable to aliens convicted of an aggravated felony under the old INA. Section 1252(b)(3)(B) now reads: "Service of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, *unless the court orders otherwise.*" 8 U.S.C. § 1252(b)(3)(B) (emphasis added); *see also* 8 U.S.C. § 1252(b)(8)(C) (the filing of a petition for review "does not require the Attorney General to defer removal of the alien"); H. Conf. Rep. No. 104–828, 104th Cong., 2nd Sess. (1996) ("As provided in Senate amendment section 142, the filing of a petition does not stay the removal of the alien unless the court orders otherwise"), *available in*, 1996 WL 563320 (Sep. 24, 1996).

As a matter of statutory construction, we "presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts." *Goodyear Atomic Corporation v. Miller*, 486 U.S. 174, 184–85, 108 S.Ct. 1704, 100 L.Ed.2d 158(1988). Congress did not provide an express standard in section 1252(b) to guide courts in their assessment of the merits of a stay request, the most logical place in which to place such a standard. *See Hanousek*, 176 F.3d at 1120. Instead, by adopting language virtually identical to that used under the pre-IIRIRA INA for determining whether to grant or deny requests for stays of deportation made by aliens convicted of an aggravated felony, Congress indicated its intention that the courts apply the traditional preliminary injunction standard as set forth in *Abbassi v. INS*, 143 F.3d 513 (9th Cir.1998) to assess the mer-

its of a stay request under the new law. *Compare* 8 U.S.C. § 1252(b)(3)(B) *with* 8 U.S.C. § 1105a(a)(3) (1995) (repealed) (INS shall not "stay the deportation of the alien pending determination of the petition of the court unless the court otherwise directs"). Within this framework, it is clear that section 1252(f) is not relevant to the question of a request to stay removal pending appeal should be granted or denied. Rather, Congress left the traditional standards used by the courts unaltered.

### D

The structure of section 1252 as a whole also indicates that the majority reaches an incorrect conclusion. The only specific mention of stays of removal in section 1252 is contained in section 1252(b)(3)(B), entitled "Stay of order." Absent from section 1252(f)(2) is any use of the word "stay": "Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2). By using the term "stay" in section 1252(b) and excluding it from section 1252(f), Congress clearly demonstrated that it understood that the terms do not have the same meaning and indicated its intent that they be treated differently. *See Cardoza–Fonseca*, 480 U.S. at 432, 107 S.Ct. 1207 ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Not only did Congress distinguish between the terms "stay" and "enjoin" in section 1252, it differentiated between the terms "restrain" and "enjoin" in section 1252(f) itself. If the term "enjoin" as used in subsections (f)(1) and (f)(2) were to be

construed—as the majority does—to be a catch-all against our ability to grant any type of equitable relief, including temporary restraining orders and stays in addition to the numerous types of injunctions, it would not have needed to carefully distinguish between the three distinct terms "enjoin," "restrain," and "stay." To interpret "enjoin" as used in subsection (f)(2) as the majority does renders the term "restrain" as used in section 1252(f)(1) and the phrase "stay of removal" in section 1252(b)(3) as mere surplusage. *See Walters v. Metropolitan Educ. Enterp., Inc.*, 519 U.S. 202, 209, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997) ("Statutes must be interpreted, if possible, to give each word some operative effect"); *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 834 (9th Cir.1996) ("We have long followed the principle that [s]tatutes should not be construed to make surplusage of any provision.") (internal quotation marks omitted). As the Supreme Court has pointed out in a similar circumstance, "the need for precision in legislative drafting" counsels against reading a precise term as a "shorthand" or "synecdoche" for a broader reference. *See American–Arab*, 525 U.S. at 482, 119 S.Ct. 936.

The text of section 1252(f)(2) also cannot be read in isolation because section 1252 as a whole expressly incorporates the Hobbs Act as the backbone for the petition for review process under the INA. *See* 8 U.S.C. § 1252(a)(1). The Hobbs Act specifically allows the court of appeals the authority to grant stay requests based on the traditional equitable standards previously applied in assessing stay requests by aggravated felons. First, the Hobbs Act makes a clear distinction between orders that temporarily stay or suspend an agency order, and an order of injunction "enjoining, setting aside, or suspending ... the order of the agency."[5] *See* 28 U.S.C.

---

5. Section 2349(b) specifically provides that "[t]he filing of the petition to review does not of itself *stay or suspend* the operation of the order of the agency, but the court of appeals in its discretion may *restrain or suspend*, ... the operation of the order pending the final

hearing and determination of the petition." 28 U.S.C. § 2349(b) (emphasis added). In cases "in which irreparable damage would otherwise result," the court "may ... order a *temporary stay or suspension* ... of the opera-

§§ 2349(a), (b). The Hobbs Act uses the term "enjoin" only *in connection with orders for permanent injunctive relief.* *See* 28 U.S.C. §§ 2342 & 2349(a). In contrast, it uses the term "restrain" in reference to temporary injunctive relief, such as a "stay pending the final hearing and determination of the petition." *See id.* section 2349(b).

Reading section 1252 as a whole demonstrates that Congress could have easily used the word "stay" to clarify the meaning of paragraph (f)(2). *See Hanousek,* 176 F.3d at 1120. Instead, Congress chose the word "enjoin." The choice of the word "enjoin," viewed in the context of section 1252 as a whole and against the backdrop of the evolution of section 1252(b)(3)(B), demonstrates that subsection (f)(2) does not apply to stays of removal.

### E

Rather than analyzing the statutory structure as a whole, the majority primarily relies on the dictionary. The danger of such an approach is the loss of context. Such is the trap that snares the majority. Quoting Black's Law Dictionary, the majority states:

"Enjoin" is defined as: "To legally prohibit or restrain by injunction." ... "Stay" is "[t]he postponement or halting of a proceeding, judgment, or the like." ... These definitions show that the plain meaning of "enjoin" includes the grant of a "stay."

The majority's conclusion does not logically follow from the two quoted definitions. Rather, the definition of "stay" makes clear that such a grant is merely temporary in nature: a "postponement," a "halting." In contrast, the term "enjoin," as defined, is far more permanent: to "prohibit," "restrain."

There is a larger lexical lesson to be learned from Black's which belies the majority analysis. "Injunction," the noun form of the verb "to enjoin," is defined to

be a "court order commanding or preventing an action." Black's Law Dictionary 788 (7th ed.1999). The definition of "injunction" also contains a lengthy list of examples of injunctions. There are affirmative injunctions, *ex parte* ones, final, interlocutory, mandatory, permanent, perpetual, preliminary, preventive, prohibitory, provisional, *quia-timet,* reparative, special and temporary injunctions. *See id.* Absent from this *exhaustive* list, and their brief definitions, is the term "stay." Nothing could be plainer, the two are not the same.

At best, resort to dictionary definitions to ascertain the correct meaning of section 1252(f)(2) provides an ambiguous result, which would dictate a construction resolved in favor of the alien. *See Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. 1207. In light of the Supreme Court's mandate that "we should not construe a statute to displace courts' traditional equitable authority absent the 'clearest command,' or an 'inescapable inference' to the contrary," *see Miller v. French,* —— U.S. ——, ——, 120 S.Ct. 2246, 2255, 147 L.Ed.2d 326 (2000), construction of this statute demands more specificity given "the need for precision in legislative drafting" in interpreting the various provisions of § 1252. *See Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 482–83, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

### II

The implausibility of the majority's interpretation of section 1252(f) is apparent in observing how the majority would apply the "clear and convincing" standard to Andreiu's motion for stay of removal. With respect to factual challenges, the majority interprets subsection 1252(f)(2) to require that an alien show by "clear and convincing evidence that the removal order was based on an erroneous finding of fact";

---

tion of the order of the agency ... *pending the hearing on the application for the interlocutory injunction."* *Id.* (emphasis added); *see also* 28 U.S.C. § 2349(a) (court has jurisdiction to

"make and enter ... a judgment determining the validity of, and enjoining, setting aside, or suspending, ... the order of the agency.").

however, with respect to questions of law, the majority departs from the plain language of the statute and conjures up the standard that "we will not stay a final removal order unless the alien establishes that the order was 'manifestly contrary to law.'" This is a significant departure from the pre-IIRIRA case law standard which applied a preliminary injunction standard to stays of deportation (now stays of removal). *See Abbassi*, 143 F.3d at 514. More importantly, the standard set forth by the majority does nothing but conflate the analysis for determining whether a stay pending appeal should issue and for resolving a petitioner's claims on the merits.

Section 1252(b)(4), which provides the scope and standard of review for resolving a petition of review on the merits, states in part:

> (B) the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,
>
> (C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and
>
> (D) the Attorney General's discretionary judgment whether to grant relief under [8 U.S.C.] section 1158(a) ... shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

8 U.S.C. § 1252(b)(4). The standard of review for issuing a stay suggested by the majority duplicates—word for word—the rule for resolving an alien's petition for review on the merits. Assuming that the immigration court's factual findings are correct, the majority's decision requires the court to determine *on the merits* whether the BIA's eligibility determination is legally correct based on, in most cases, a brief motion for stay. This simply does not make sense.[6] Rather, the appropriate standard we should apply is the traditional test described in *Abbassi* and employed by virtually every circuit under the transitional rules.

### III

In sum, with all due respect, the majority gets it wrong. It misinterprets the plain language of 8 U.S.C. § 1252(f) and ignores the structure of section 1252 as a whole in holding that section 1252(f)(2) requires an alien to establish by "clear and convincing evidence" that a stay of removal pending appellate review is warranted. In doing so, the majority transforms the word "enjoin" to synecdoche, and disregards the Supreme Court's "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). If Congress had intended the result reached by the majority, that would, of course, be the end of the matter. However, the plain language and structure of the statute dictate otherwise.

The consequence of this holding is that thousands of asylum seekers who fled their native lands based on well-founded fears of persecution will be forced to return to that danger under the fiction that they will be

---

6. By applying the "clear and convincing evidence" standard to individual challenges to the IIRIRA's procedural rules, Congress essentially places upon aliens the heavy burden of showing that INS procedures as applied are prohibited as a matter of law. Congress appears to have drawn this standard from immigration cases that have addressed whether it intended to preclude judicial review of the legality of an INS action. *See, e.g., Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 63–64, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993).

In these cases, the Supreme Court has required a showing of "clear and convincing evidence" of congressional intent to overcome the "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action." *Id.* (quoting *McNary*, 498 U.S. at 496, 111 S.Ct. 888). Requiring individual aliens to make a "clear and convincing" showing that INS procedures are prohibited as a matter of law is therefore consistent with the historical backdrop against which section 1252 was enacted.

safe while awaiting the slow wheels of American justice to grind to a halt.

I respectfully dissent.